**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 18-1291

EQUINOR USA ONSHORE PROPERTIES INC., f/k/a STATOIL USA
ONSHORE PROPERTIES, INC.,

Plaintiff – Appellee,

v.

PINE RESOURCES, LLC,

Defendant – Appellant.

Appeal from the United States District Court for the Southern District of West Virginia,
at Charleston.  Irene C. Berger, District Judge.  (2:14-cv-21169)

Argued:  December 11, 2018                    Decided:  March 6, 2019

Before GREGORY, Chief Judge, MOTZ, and FLOYD, Circuit Judges.

Affirmed by published opinion.  Chief Judge Gregory authored the opinion, in which
Judge Motz and Judge Floyd joined.

**ARGUED:**  David Allen Barnette, JACKSON KELLY, PLLC, Charleston, West
Virginia, for Appellant.  Fields Alexander, BECK REDDEN LLP, Houston, Texas, for
Appellee.  **ON BRIEF:**  Michael M. Fisher, Vivian Hatzi Basdekis, JACKSON KELLY,
PLLC, Charleston, West Virginia, for Appellant.  Joel T. Towner, BECK REDDEN LLP,
Houston, Texas; Bridget Furbee, Bridgeport, West Virginia, John J. Meadows, STEPTOE
& JOHNSON PLLC, Charleston, West Virginia, for Appellee.

GREGORY, Chief Judge:

This appeal concerns a contractual obligation to "spud" three wells on a tract of land in West Virginia. The parties dispute whether the obligation to "spud" the wells is an obligation only to begin drilling or to complete the wells to the point of mineral production. Following a bench trial, the district court determined that the Purchase and Sale Agreement ("PSA") executed between Petitioner Pine Resources, LLC and the predecessor of Respondent Equinor USA Onshore Properties, Inc. f/k/a Statoil USA Onshore Properties, Inc. contains no requirement that the spudded wells be completed to production. We agree with the district court that the PSA does not require hydrocarbon production. We therefore affirm.

I.

A.

Pine Resources sold its Marcellus mineral rights in 565 acres of land in Barbour County, West Virginia (the "Langley tract") to PetroEdge Energy LLC, a non-party, pursuant to a November 7, 2008 PSA.[1] In addition to documenting the terms of the mineral rights sale, the PSA set forth certain drilling obligations on the Langley tract.

---

[1] Pine Resources's principal testified at trial that mineral rights are typically leased, not sold. J.A. 1562–63. In a typical mineral rights lease, the lessee assumes the obligation to develop the mineral rights within a specified time period. J.A. 1563. If that obligation is not fulfilled, the mineral rights revert to the lessor. *Id.* Here, rather than lease its mineral rights, Pine Resources chose to sell them to PetroEdge and retain only a royalty interest in hydrocarbons produced therefrom. J.A. 1562. As Pine Resources's principal explained, the deal was structured in this way for tax purposes. J.A. 1572.

Specifically, PetroEdge agreed to apply for a meter tap on a gas transmission line on or before 60 days after executing the PSA, *i.e.* December 7, 2008. Following installation of that meter tap, the PSA provided for the "spudding" of three wells: the first was to be spudded within one year of the meter tap's installation, and a total of three wells were to be spudded within five years of the meter tap's installation. The PSA permitted PetroEdge to satisfy the spudding obligations by spudding horizontal wells with openings that were off the Langley tract so long as any portion of the well traversed the Langley tract. Pursuant to the PSA, Pine Resources retained an overriding royalty interest ("ORRI") of 18% of the hydrocarbons "produced from or attributable to" the mineral rights that were sold to PetroEdge. J.A. 1734.

The PSA contained other provisions related to the parties' drilling and surface operations. The parties agreed to meet on a quarterly basis to consult regarding each other's drilling plans and to use reasonable efforts to cooperate with each other in their surface operations. The PSA also established procedures to be used if a party chose to abandon a "producing well" that ceased to produce hydrocarbons. *Id.*

A year and a half after the PSA was executed, concern grew that PetroEdge would be unable to meet the deadline for the spudding of the first well due to a delay in installation of the meter tap. PetroEdge had been able to secure only one of two rigs that it needed to drill the first well, which was to be a horizontal well with a surface opening outside of the Langley tract. The second rig was necessary to drill the horizontal portion of the well, which would eventually penetrate the Langley tract. The parties agreed to extend the deadline for spudding of the first well to December 31, 2011 in exchange for

3

$100,000 in consideration paid to Pine Resources. The parties also agreed that the meter tap installation date would be set at April 1, 2009, regardless of the actual installation date, and that the deadline for spudding of the second and third wells would be April 1, 2014. After a second delay, the parties agreed to amend the PSA a second time to allow PetroEdge until March 31, 2012 to satisfy its contractual obligations in connection with the first well. No additional consideration was paid.

PetroEdge began drilling the first well, known as Bumgardner 5-2H, in December 2011. The well was drilled to 6,134 feet and penetrated the Langley tract in March 2012. It was never completed, however, and has never produced hydrocarbons.

After drilling the first well, the parties continued to meet on a quarterly basis until September 2012, when PetroEdge missed the quarterly meeting. In late 2012, PetroEdge's CEO Larry Richard notified Pine Resources that PetroEdge had sold its mineral interests to Statoil. The PetroEdge-Statoil purchase agreement provided that Statoil would assume responsibility for the "performance of all express and implied obligations" arising from "instruments in the chain of title to the Assets, the Leases, the Contracts and all other orders, contracts and agreements to which the Assets are subject, including the payment of royalties and overriding royalties." J.A. 2440. Schedule 3.25 of that contract listed the Pine Resources-PetroEdge PSA as one of these contracts and indicated: "The first drilling obligation satisfied by drilling the Bumgardner #5-2H Well. Must drill at least two (2) additional wells, vertical or horizontal, on or before April 1, 2014 (may be negotiable)." J.A. 1856.

4

After Pine Resources learned of Statoil's purchase of PetroEdge's mineral rights, Pine Resources's principals made several attempts to contact Statoil to schedule quarterly meetings. They initially received no formal response. Months later, on July 11, 2013, Statoil and Pine Resources met. During that meeting, Statoil's Joshua Ozment informed Pine Resources that a second well had been permitted on the same pad as the first well and that Ozment assumed that his company would drill that well.

Also on July 11, 2013, Pine Resources notified Statoil in writing of what Pine Resources considered to be three ongoing violations of the PSA. First, Pine Resources stated that Statoil had failed to meet its quarterly meeting obligation. Second, Pine Resources considered Statoil's failure to "complete[ ] and turn[ ] into production" the first well a breach of the PSA. J.A. 1823. And third, Pine Resources noted the remaining drilling obligations and requested an update of Statoil's plans to satisfy those obligations. Statoil did not respond to that correspondence, but the company's vice president of business development forwarded Pine Resource's letter internally, stating, "Sounds like we are in some trouble, but maybe you guys get a lot of these." J.A. 1857.

Pine Resources followed up its July 11, 2013 letter with additional emails and phone calls in an attempt to ascertain Statoil's plans to satisfy its obligations under the PSA. In December 2013, Statoil informed Pine Resources that it would not complete the first well or drill the second or third wells and asked that Pine Resources explain its demands in writing. Pine Resources sent a demand letter to Statoil, stating "[t]here was an immediate requirement to contract with a pipeline for service and a requirement to drill three wells." J.A. 1826. A month later, Statoil responded that it was "not obligated

5

to complete the [first well] until the Langley Meter Tap is installed." J.A. 1900. Because the meter tap had not yet been installed, the obligation to spud the second and third wells, according to Statoil, had not yet been triggered.

Pine Resources responded with several additional emails and other communications to Statoil, explaining among other things that Pine Resources had agreed with PetroEdge that the meter tap installation date would be April 1, 2009. Pine Resources's correspondence initially went unanswered. When Statoil finally did respond, its position was: "If you sue us, we'll bankrupt you." J.A. 1547.

Statoil took no steps to complete the Bumgardner 5-2H Well or to begin drilling the second or third wells on the Langley tract. Statoil sold its interest in the Marcellus mineral rights in 2015.

### B.

On July 8, 2014, Statoil brought suit against Pine Resources in the United States District Court for the Southern District of West Virginia. The complaint sought a judgment declaring that Statoil owed no obligations to Pine Resources under the PSA beyond making royalty payments. Pine Resources filed a counterclaim, asserting breach of Section 5.7(b) of the PSA—the section setting forth the spudding obligations.

The parties filed cross-motions for summary judgment. The district court granted summary judgment to Statoil and denied Pine Resources's motion for summary judgment on its counterclaim. In doing so, the district court found that, under the unambiguous language of the PSA, the spudding obligations extended only to the "Purchaser," which the court read to mean PetroEdge alone.

6

Pine Resources appealed, and we reversed in an unpublished per curiam opinion. *Statoil USA Onshore Props. Inc. v. Pine Resources, LLC*, 675 F. App'x 285 (4th Cir. 2017). We held that the spudding obligations extended beyond PetroEdge to its successors and assigns and, therefore, to Statoil as PetroEdge's assign. *Id.* at 289–90. We remanded with instructions to enter summary judgment in favor of Pine Resources on Statoil's declaratory judgment claim and to consider in the first instance Statoil's argument that Pine Resources sustained no damages in connection with the breach of contract counterclaim. *Id.* at 296.

On remand, the parties filed cross-motions for summary judgment on the issue of damages. The district court denied both motions, and the parties proceeded to a bench trial.

At trial, the district court ruled on two issues: (1) whether the PSA required production in addition to drilling of the wells and (2) the amount of damages that resulted from Statoil's breach of the PSA. After a two-day bench trial, the district court found in favor of Statoil. The court determined that the contract language is ambiguous with respect to whether it requires production. Looking to extrinsic evidence, the court concluded that the PSA contains no production requirement. The court also noted that Pine Resources's evidence of its damages was based entirely on royalty losses tied to well production; Pine provided no evidence of damages resulting from Statoil's failure to spud the second and third wells. Therefore, the court awarded no damages.

Pine Resources now appeals to this Court.

7

## II.

We "review a judgment following a bench trial under a mixed standard of review—factual findings may be reversed only if clearly erroneous, while conclusions of law, including contract construction, are examined de novo." *Dan Ryan Builders, Inc. v. Crystal Ridge Dev., Inc.*, 783 F.3d 976, 979 (4th Cir. 2015) (quoting *Roanoke Cement Co. v. Falk Corp.*, 413 F.3d 431, 433 (4th Cir. 2005)). The scope of our review is narrow: "we do not exercise de novo review of factual findings or substitute our version of the facts for that found by the district court." *Walton v. Johnson*, 440 F.3d 160, 173 (4th Cir. 2006) (citing *Jiminez v. Mary Wash. College*, 57 F.3d 369, 378 (4th Cir. 1995)). Rather, "[i]f the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Id.* (alteration in original) (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 573–74 (1985)). Nonetheless, we may reverse a district court's factual finding if, "on the entire evidence," we are "left with the definite and firm conviction that a mistake has been committed." *Id.* (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)).

## III.

### A.

We begin by reviewing the district court's determination that the PSA contains no hydrocarbon production obligation. The PSA provides that its construction is controlled

8

by West Virginia law. Under West Virginia law, "the function of a court is to ascertain the intent of the parties as expressed in the language used by them" in their contract. *Zimmerer v. Romano*, 679 S.E.2d 601, 610 (W. Va. 2009) (per curiam) (quoting *Davis v. Hardman*, 133 S.E.2d 77, 81 (W. Va. 1963)). In doing so, courts must read contracts "as a whole, taking and considering all the parts together." *Id.* (citation omitted). Reading the contract as a whole, we must be mindful that "specific words or clauses . . . are not to be treated as meaningless, or to be discarded, if any reasonable meaning can be given them consistent with the whole contract." *Dunbar Fraternal Order of Police, Lodge No. 119 v. City of Dunbar*, 624 S.E.2d 586, 591 (W. Va. 2005) (per curiam) (citation omitted).

Generally, "[a] valid written instrument which expresses the intent of the parties in plain and unambiguous language . . . will be applied and enforced according to such intent." *Arnold v. Palmer*, 686 S.E.2d 725, 733 (W. Va. 2009) (brackets in original) (citations omitted). When a contract's terms are clear and unambiguous, "[e]xtrinsic evidence will not be admitted to explain or alter the terms of [the] contract." *Faith United Methodist Church & Cemetery of Terra Alta v. Morgan*, 745 S.E.2d 461, 481 (W. Va. 2013) (citation omitted).

On the other hand, where contract language is ambiguous, extrinsic evidence may be considered to aid the court in its construction of the contract. *Yoho v. Borg-Warner Chems.*, 406 S.E.2d 696, 697 (W. Va. 1991) (per curiam). Language is ambiguous when it is "reasonably susceptible of two different meanings" or is "of such doubtful meaning that reasonable minds might be uncertain or disagree as to its meaning." *Payne v.*

9

*Weston*, 466 S.E.2d 161, 166 (W. Va. 1995) (quoting *Shamblin v. Nationwide Mut. Ins. Co.*, 332 S.E.2d 639, 642 (W. Va. 1985)).

1.

We agree with the district court that the PSA is ambiguous as to whether it required PetroEdge, and by assignment Statoil, to complete the three wells to production.

The PSA required that the purchaser "spud" three wells, but the contract does not define the term "spud." Nor does it contain an explicit requirement of well completion or production. Therefore, we first look to the plain meaning of "spud." *Fraternal Order of Police, Lodge No. 69 v. City of Fairmont*, 468 S.E.2d 712, 715 (W. Va. 1996).

The plain meaning of "spud" refers only to the initial drilling of wells, not completion or production. The term's dictionary definition is "to begin to drill (a hole for an oil well) by imparting an up-and-down motion to the drilling bit." *Spud*, Oxford English Dictionary (2d ed. 1989); J.A. 2324. This meaning is consistent with the way in which "spud" has been understood in the oil and gas industry. *See* John S. Lowe, *Oil and Gas Law in a Nutshell* 6 (6th ed. 2014) ("The well is spudded when the drill bit begins to bite into the ground."); *Caltex Oil Venture v. Comm'r of Internal Revenue*, 138 T.C. 18, 28–29 (2012) ("[A] well is 'spudded' when the drill bit penetrates the ground for purposes of drilling an oil or gas well."); *L&B Oil Co., Inc. v. FERC*, 665 F.2d 758, 763 (5th Cir. 1982) ("[S]pudding in" is "the initial boring of the hole, to a depth of approximately 100 feet, in drilling an oil or gas well." (citing H. Williams & C. Meyers, *Manual of Oil and Gas Terms* 564 (4th ed. 1976))); J.A. 2926 (Schlumberger Oilfield

Glossary defining "spud" to mean "to start the well drilling process by removing rock, dirt and other sedimentary material with the drill bit").

Although one of Pine Resources's principals, Richard Heffelfinger, conceded at trial that the industry meaning of "spud" is the initiation of the drilling process, J.A. 1601–03, Pine Resources argues that the spudding requirements in Section 5.7 should be read in the context of the entire PSA, *see Zimmerer*, 679 S.E.2d at 610, and that such a reading demonstrates that the parties intended the wells to be completed and begin producing. "In the construction of written instruments technical words are presumed to have been used in a technical sense and should ordinarily be given their strict meaning; but this rule is not absolute and when it appears from the context that another meaning was intended such words will not be applied in their technical sense." *Lane v. Bd. of Educ. of Lincoln Cty.*, 131 S.E.2d 165, 169 (W. Va. 1963) (citations omitted). Accordingly, we must examine the PSA as a whole to determine whether the parties intended the spudding requirement to mean anything other than it is ordinarily understood to mean in the oil and gas industry.

The PSA contains several provisions that call into question the parties' intent in their use of the term "spud." For example, the PSA provides for cooperation in parallel drilling and well operations, including quarterly meetings to discuss ongoing operations. The PSA also sets forth procedures for well abandonment and restoration, which apply only to producing wells that cease production. And the PSA provides for an ORRI in hydrocarbon production. As we observed in our previous opinion, these provisions suggest that the PSA has the "apparent objective of promoting mineral production."

11

*Statoil USA Onshore Props.*, 675 F. App'x at 291. Indeed, the abandonment and ORRI provisions would be rendered meaningless in the absence of producing wells. Thus, these provisions cast doubt on whether the parties intended the term "spud" to mean merely the initiation of the drilling process. *See Dunbar Fraternal Order of Police*, 624 S.E.2d at 591 ("[S]pecific words or clauses . . . are not to be treated as meaningless, or to be discarded, if any reasonable meaning can be given them consistent with the whole contract." (citation omitted)).

Statoil argues that we need not resort to parol evidence in light of the fact that Pine Resources and PetroEdge were both represented by counsel during their negotiation of the PSA. *See Iafolla v. Douglas Pocahontas Coal Corp.*, 250 S.E.2d 128, 135 (W. Va. 1978) (explaining that "the strength of a court's conviction with regard to the applicability of the parole evidence rule to any given contract increases in direct proportion to the degree to which the parties are commercial parties represented by counsel"). The fact of representation alone, however, does not persuade us that the PSA's drilling requirement is unambiguous. Because the PSA is reasonably susceptible to two meanings—(1) that it required only that drilling be commenced and (2) that it required drilling completion and mineral production—we consider the extrinsic evidence to determine the intent of the parties.

2.

Pine Resources challenges the district court's evaluation of the evidence in two primary respects. First, Pine Resources takes issue with one of the district court's credibility findings. Second, Pine Resources argues that the district court ignored

12

substantial extrinsic evidence such that its conclusions are not supported by the weight of the evidence. We disagree.

a.

At trial, Heffelfinger testified that he believed the spudding obligations required completion of the wells and production of hydrocarbons. He testified that he made that clear during a conversation with Richard, PetroEdge's CEO, about extension of the spudding deadlines. According to Heffelfinger, Richard confirmed that PetroEdge intended to complete the wells. Despite the lack of evidence to refute Heffelfinger's testimony regarding his conversation with Richard, the district court found this aspect of Heffelfinger's testimony noncredible based on his tone and demeanor. J.A. 3249–50.

Given the lack of refuting evidence, Pine Resources argues that the adverse credibility finding was erroneous. However, we have held that we "may not reverse a trier of fact, who had the advantage of hearing the testimony, on a question of credibility." *Doyle v. Arlington Cty. Sch. Bd.*, 953 F.2d 100, 104–05 (4th Cir. 1991) (quoting *McCrary v. Runyon*, 515 F.2d 1082, 1086 (4th Cir. 1975), *aff'd*, 427 U.S. 160 (1976)); *see also* Fed. R. Civ. P. 52(a)(6) ("[T]he reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility."). We decline to second-guess the district court's credibility determinations here.

b.

Nor do we find that the district court's conclusion is unsupported by the "clear weight of the evidence considered in light of the entire record." *Jiminez*, 57 F.3d at 379. Pine Resources highlights three categories of evidence that it argues weigh against the

13

district court's judgment: (1) the parties' negotiation of two extensions of the drilling deadline, (2) Heffelfinger's credible testimony, and (3) correspondence from Pine Resources to Statoil explaining its position regarding breaches of the PSA. We address each category of evidence in turn.

The district court concluded that the negotiated extensions of the drilling deadline weighed against a finding that the PSA requires production because those extensions did not reference any related production requirement. Pine Resources asserts that the deadline extensions show the opposite—that production was required—because those extensions of time were needed to allow PetroEdge to penetrate the Marcellus minerals and complete the first well, not merely start it. This argument ignores a key fact about the first well: the surface hole of that well was not located on the Langley tract. Thus, for the well to satisfy one of Section 5.7(b)'s spudding requirements, the horizontal length of the well had to reach the Langley tract.[2] Heffelfinger acknowledged at trial that

---

[2] Pine Resources asserts that the PSA required the first well to reach the Marcellus zone, thereby demonstrating that the parties intended "spud" to mean more than simply scratching the surface. Pet'r Br. 27. The PSA, however, required a spudded well to "traverse[ ]" or "include[ ]" "any portion of the Contract Area," not the Marcellus zone. J.A. 1734. The "Contract Area" is defined as "the lands subject to the Mineral Rights or pooled, unitized or communitized therewith." J.A. 1726. And "Mineral Rights" are defined to include "all rights to the extent relating to, or necessary or convenient in connection with, the ownership, development and operation of the [hydrocarbon] interests . . . including any access rights and rights to install pipelines, utilities, surface facilities and other infrastructure necessary or convenient in the exploration for, and development, production, processing and transportation of, Hydrocarbons." J.A. 1727. Thus, the Covered Area, which the well had to traverse or include in order to count toward Section 5.7(b)'s spudding requirements, is much broader than simply the Marcellus zone and includes the surface area of the Langley tract to the extent that the surface area was necessary to PetroEdge and Statoil's hydrocarbon operations.

14

Pine Resources would be entitled to royalties only if the well reached the Langley tract. J.A. 1582. Drilling of the well began in December 2011, but the well did not reach the Langley tract until March 2012, the second extended deadline. In fact, Heffelfinger testified that the purpose of the deadline extensions was to allow PetroEdge to "begin the process of spudding the first well." J.A. 1598. As Heffelfinger explained, "It was never anticipated that [the] well would be completed by" the second extended deadline. J.A. 1600. In light of these considerations, the district court's finding that the extensions of time do not evince an intended production requirement is not clearly erroneous.

The other evidence highlighted by Pine Resources—Heffelfinger's testimony and correspondence from Pine Resources to Statoil—similarly fails to tip the scale in favor of Pine Resources. In testimony not subject to the adverse credibility determination, Heffelfinger stated that the purpose of the spudding obligation—added at the behest of Pine Resources—was to ensure that PetroEdge developed its mineral rights. Heffelfinger explained that Pine Resources had previously leased the Langley tract to another company, which then sat on the mineral rights without developing the land during the entirety of the leasehold. In selling the mineral rights to PetroEdge, Heffelfinger testified, he made clear that the Langley tract was the company's most valuable tract and that Pine Resources wanted to see it developed. According to Heffelfinger, he was "adamant" in negotiations with PetroEdge that development had to take place within a specific time. J.A. 1502. And PetroEdge's primary concern was with the timing requirement in relation to the meter tap; PetroEdge "didn't want to be required to drill a well and then not be able to produce it immediately." *Id.*

15

Additionally, Pine Resources highlights correspondence that it sent to Statoil after Statoil assumed the PSA: a July 11, 2013 letter in which Pine Resources explained that it viewed the failure to complete the first well as a breach of the PSA and an October 11, 2013 email in which Heffelfinger reiterated that Pine Resources believed the failure to complete the first well to be a "violation of the intent of the agreement," J.A. 2325.[3]

Although the district court, after making factual findings with respect to the above evidence, failed to explain why it apparently gave little or no weight to the evidence, the evidence as a whole—including the contractual language and extrinsic evidence—supports the district court's conclusion that the PSA does not require production. As Heffelfinger conceded at trial, the PSA does not state how minerals were to be produced, nor does it require a specific type of well. *See* J.A. 3026 (expert testimony acknowledging that different types of wells "are completed differently"). The PSA contains no deadline by which production was to begin and does not establish any

---

[3] Pine Resources also points to a November 12, 2013 letter in which Heffelfinger indicated that Pine Resources considered the failure to complete the first well to be a breach of Section 5.7 of the PSA and to a December 17, 2013 letter again addressing the alleged breach of the PSA due to failure to complete the wells. Statoil objected to the admission of those letters as irrelevant and settlement discussions subject to exclusion under Federal Rule of Evidence 408. *See* Fed. R. Evid. 408(a) (providing that evidence of conduct or a statement made during compromise negotiations about a claim "is not admissible—on behalf of any party—either to prove or disprove the validity or the amount of a disputed claim"). At trial, the district court admitted those communications subject to review based on the objections. J.A. 1478. In its opinion, the district court states in a footnote that "those exhibits that contain references to settlement or informal resolution of the alleged breach are inadmissible under Rule 408." J.A. 3251. The November 12, 2013 letter closes by requesting a meeting so that the parties could "agree on the proper amount of damages." J.A. 1861. The December 17, 2013 letter is titled "FOR SETTLEMENT PURPOSES ONLY." J.A. 1826. Therefore, it appears that the district court ultimately excluded those letters under Rule 408.

method of ascertaining damages or lost royalties based on a failure to produce. Yet Heffelfinger testified that there could exist circumstances—such as adverse economic conditions—under which production would not be required. As the district court aptly highlighted, "[w]ithout contract language to apply, it is unclear how the Court could evaluate whether Statoil was required to produce despite its determination that doing so would not be profitable." J.A. 3254. And while Heffelfinger testified that Section 5.7 was included in the contract because Pine Resources wanted to ensure development, the parties—who negotiated at length while represented by counsel—included no explicit requirement for completion of the wells or mineral production. We agree with the district court that the lack of specific contractual provisions governing production would render any implied production requirement difficult, if not impossible, for a court to enforce.

In addition to the contract language, the extrinsic evidence shows that at least PetroEdge believed that its obligations were fulfilled by beginning to drill.[4] Prior to the transfer of its mineral rights to Statoil, PetroEdge represented to Statoil that it had "satisfied the first drilling obligation by drilling the Bumgardner 5-2H Well." J.A. 1816.[5]

---

[4] We acknowledge that the district court appears to have construed the ambiguous contract in favor of, rather than against, the PSA's drafter PetroEdge. While ambiguous contracts are generally construed against their drafter, "[t]he general rule of construing an ambiguous contract against the drafter does not mean automatically holding in favor of the other party. . . . Otherwise, extrinsic evidence would be irrelevant." *W. Va. Inv. Mgmt. Bd. v. Variable Annuity Life Ins. Co.*, 820 S.E.2d 416, 430 n.46 (W. Va. 2018) (omission in original) (citation omitted).

[5] Pine Resources lodges, for the first time on appeal, a hearsay objection to the email from PetroEdge to Statoil. Reply Br. 12. That email was admitted at trial without any objection. J.A. 1477. Because no hearsay objection was made below, such an (Continued)

17

Then, in selling its rights to Statoil, PetroEdge memorialized its position, in Schedule 3.25 of the purchase agreement, that "[t]he first drilling obligation [was] satisfied by drilling the Bumgardner #5-2H Well." J.A. 1856. Moreover, Pine Resources's own expert witness testified that the first well, though not completed or producing, had "been spud" and "drilled." J.A. 3024.

In sum, while there is evidence that Pine Resources believed the PSA required production, the record as a whole supports the district court's conclusion that the intent of the parties to the PSA was not that PetroEdge or its assigns would complete the three wells to production in the timeframe established by Section 5.7(b). The PSA contemplates mineral production but stops short of requiring it.

B.

We also affirm the district court's conclusion that Pine Resources failed to prove that it sustained any damages. A party injured by a breach of a contractual obligation is entitled to recover damages "as may fairly and reasonably be considered as arising naturally . . . from the breach of the contract itself, or such as may reasonably be supposed to have been in the contemplation of both parties at the time they made the contract, as the probable result of its breach." *Desco Corp. v. Harry W. Trushel Const. Co.*, 413 S.E.2d 85, 89 (W. Va. 1991) (quoting *Ky. Fried Chicken of Morgantown, Inc. v.*

---

objection is untimely. *Padilla v. Troxell*, 850 F.3d 168, 178 (4th Cir. 2017); Fed. R. Evid. 103(a) (requiring "timely" and "specific" objection in order to "claim error in a ruling to admit or exclude evidence").

18

*Sellaro*, 214 S.E.2d 823, 827 (W. Va. 1975)). "[R]ecoverable damages must be proved with reasonable certainty." *Sellaro*, 214 S.E.2d at 828 (citations omitted).

Statoil does not dispute that it breached the PSA by failing to spud the second and third wells. As the district court noted, however, Pine Resources's evidence of damages was related entirely to royalties to which it would have been entitled had the three wells been completed and producing. No separate evidence of damages sustained solely due to the failure to spud the second and third wells was introduced. Absent evidence of damages flowing from Statoil's failure to begin drilling the second and third wells, the district court committed no error in granting judgment to Statoil.

IV.

For the foregoing reasons, we affirm the district court's judgment.

*AFFIRMED*