**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 21-1504**

---

ACCIDENT INSURANCE COMPANY, INC., a South Carolina Corporation,

Plaintiff − Appellant,

v.

U.S. BANK NATIONAL ASSOCIATION,

Defendant and Third-Party Plaintiff – Appellee,

v.

SOUTHPORT LANE ADVISORS LLC; SOUTHPORT SPECIALTY FINANCE LLC; ADMINISTRATIVE AGENCY SERVICES LLC; ALEXANDER CHATFIELD BURNS,

Third-Party Defendants,

BLACK & LOBELLO,

Intervenor.

---

Appeal from the United States District Court for the District of South Carolina, at Columbia.  J. Michelle Childs, District Judge.  (3:16−cv−02621−JMC)

---

Argued:  March 10, 2022                                    Decided:  August 29, 2022

---

Before WILKINSON and DIAZ, Circuit Judges, and FLOYD, Senior Circuit Judge.

---

Affirmed in part, vacated in part, and remanded by unpublished opinion. Judge Diaz wrote the opinion, in which Judge Wilkinson and Senior Judge Floyd joined.

———————————

**ARGUED:** Jordan Christopher Calloway, MCGOWAN, HOOD & FELDER, LLC, Rock Hill, South Carolina, for Appellant. Michael M. Krauss, GREENBERG TRAURIG, LLP, Minneapolis, Minnesota, for Appellee. **ON BRIEF:** Chad A. McGowan, MCGOWAN, HOOD & FELDER, LLC, Rock Hill, South Carolina, for Appellant. Johanna R. Hyman, GREENBERG TRAURIG, LLP, Minneapolis, Minnesota; Meliah Bowers Jefferson, WYCHE, P.A., Greenville, South Carolina, for Appellee.

———————————

Unpublished opinions are not binding precedent in this circuit.

DIAZ, Circuit Judge:

Accident Insurance Company, Inc. ("AIC"), a South Carolina insurer, allowed a Texas-based insurer to conduct business in South Carolina under AIC's name in return for a share of policy premiums. To offset AIC's risk in the venture, the insurers contracted with U.S. Bank to administer a trust account containing collateral. When the insurance arrangement went south, AIC sought to withdraw all trust assets to cover its newfound liabilities. But it soon discovered that the trust account held several illiquid assets, frustrating its efforts to retrieve the collateral.

AIC sued the Bank, alleging breach of contract, breach of fiduciary duty, and negligent misrepresentation, among other claims. Chief among the Bank's duties, AIC said, were to (1) determine that AIC could liquidate trust assets without third-party consent before accepting them for deposit; (2) take all necessary steps to deliver assets upon request; and (3) provide monthly account statements. AIC argued the Bank violated these duties when it admitted certain securities into the trust account, failed to transfer those securities when requested, and misrepresented the securities in account statements. After a bench trial, the district court ruled for the Bank.

AIC now appeals, contending the district court erred in holding that the Bank: (1) negotiated trust assets consistent with its contractual obligations; (2) took all necessary steps to deliver trust assets; and (3) didn't misrepresent certain assets by use of a "Taxable Bonds" heading in account statements.

We discern no error in the district court's assessment of the Bank's duties to deliver trust assets and provide accurate account statements. So we affirm its rejection of those

3

claims. But we agree with AIC that the court misinterpreted the Bank's contractual duty to determine trust assets were in the proper form before accepting them for deposit. And when properly construed, we find the Bank breached that duty. We vacate that part of the court's judgment and remand for further proceedings.

I.

A.

In March 2013, Accident Insurance Company, Inc. and Dallas National Insurance Company entered a so-called fronted reinsurance program. Under the program agreement, AIC would allow Dallas National to sell commercial insurance in South Carolina under AIC's name in exchange for a share of policy premiums. Dallas National would administer the policies and pay all related claims, bearing liability in the first instance. But if Dallas National were to become insolvent and unable to honor the policies, liability would fall to AIC.

The insurers' agreement addressed this contingency. Dallas National would establish and maintain a trust account for AIC's benefit. So long as AIC risked exposure under the program, Dallas National had to maintain collateral in the trust account equal to at least its policy obligations. The insurers enlisted U.S. Bank to serve as trustee of the account.

B.

AIC, Dallas National, and the Bank thus entered a trust agreement governed by Delaware law. Their agreement expressed its purpose at the outset: AIC (as the

4

"Beneficiary") desired Dallas National (as the "Grantor") to "secure payments of all amounts" it might owe at any time to AIC under the reinsurance program. J.A. 1590 (cleaned up). In turn, the Bank agreed to act as "Trustee" and hold Dallas National's deposits "in the trust account for [AIC's] sole use and benefit." *Id.* (cleaned up).

The trust agreement then set forth the rights and duties of the parties. The Bank agreed to receive assets from Dallas National, deposit them into the trust account, and hold them for safekeeping. Paragraphs 2(b) and 8(b) set out a specific duty that the Bank would have as to the nature of trust assets.

Paragraph 2(b) stated:

The [Bank] shall have no duty or responsibility with respect to the qualification, character[,] or valuation of the Assets deposited in the Trust Account, except to determine whether the Assets are in such form that [AIC], or the [Bank] upon direction by [AIC], may whenever necessary negotiate any such Assets without consent or signature from [Dallas National] or any other person or entity.

J.A. 1591.

Paragraph 8(b) expanded on Paragraph 2(b)'s requirements:

Before accepting any Asset for deposit to the Trust Account, the [Bank] shall determine that such Asset is in such form that [AIC] whenever necessary may, or the [Bank] upon direction by [AIC] will, negotiate such Asset without consent or signature from [Dallas National] or any person or entity other than the [Bank] in accordance with the terms of this Agreement.

J.A. 1593.[1]

---

[1] We refer to the Bank's duty to determine that AIC could negotiate proposed trust assets without third-party consent as the Bank's "negotiability" determination.

5

The Bank had other affirmative duties, two of which are relevant here. Paragraph 3(b) of the trust agreement required the Bank, upon receiving AIC's withdrawal notice, to "immediately take any and all steps necessary to transfer absolutely and unequivocally to [AIC] or to its order all right, title[,] and interest in the Assets being withdrawn." J.A. 1591. In another provision, the Bank agreed to "furnish . . . an accounting of all Assets in the Trust Account upon its inception and thereafter at [monthly] intervals." J.A. 1593.

The trust agreement also limited the Bank's discretion and liability. As we've mentioned, other than the negotiability determination, Paragraph 2(b) absolved the Bank of any "duty or responsibility" touching on the "qualification, character[,] or valuation" of trust assets. J.A. 1591. The Bank could also "follow and rely upon all instructions" from AIC and Dallas National unless the trust agreement provided otherwise. J.A. 1594. The Bank wouldn't "incur any liability" from actions it took "in good faith [reliance] on such instructions." *Id.* Nor would the Bank be liable for any loss arising out of performance of its contractual duties unless "its own negligence, willful misconduct[,] or lack of good faith" caused the loss. *Id.*

## C.

In December 2013, Dallas National funded the trust account. Its initial deposit comprised about $9.3 million in municipal bonds. Within a month, the Bank allowed Dallas National to sell those bonds. The Bank then accepted two deposits from Dallas National: (1) nearly $9.4 million in Destra Targeted Income Unit Investment Trust securities ("Destra units"); and (2) $193,000 in shares of Camelot Asset Holding, LLC.

6

We pause to discuss the Destra units. The Destra Unit Investment Trust is a registered investment company under the Investment Company Act of 1940. The Destra trust issued securities—the Destra units—to investors, representing undivided, fractional interests in the Destra trust's underlying assets. Those assets included interests in assorted loans, companies, and artwork.

The Destra trust's governing master agreement named Administrative Agency Services, LLC to manage the securities as the Destra units' "Administrative Agent." J.A. 1710. The Administrative Agent had the exclusive responsibility to value the Destra units and maintain the official book of registered unitholders. The master agreement also gave the Administrative Agent *sole discretion* to approve all unit transfers and unitholders.

Turning back to the insurers' trust account, Dallas National continued to withdraw and replace trust assets after funding the account. The Bank's account statements reflected Dallas National's activity and provided some detail on the Destra units. Listing these securities as "Taxable Bonds," the statements explained the Destra units were "held or controlled by the customer or by a third party on behalf of the customer . . . . [The] Bank [did] not have actual custody or control." J.A. 1814–15.

D.

By April 2014, the insurers' arrangement fell apart. AIC learned that Dallas National was insolvent. So it assumed Dallas National's liabilities and became responsible for handling outstanding claims. At that time, the trust account contained about $6.9 million in Destra units, $193,000 in Camelot shares, about $5.3 million in municipal bonds, and about $15,000 in cash.

7

AIC sent a withdrawal notice to the Bank, seeking transfer of all trust assets. The Bank informed AIC that it would soon transfer all bonds and cash in the account but that the Destra units and Camelot shares would "require additional paperwork." J.A. 1653.

The Bank contacted AIC two weeks later. It explained that the Destra trust's Administrative Agent had asked to speak with AIC about its "withdrawal request and the status of the Destra units." J.A. 1659. It also provided contact information for the Administrative Agent's representative. Upon learning that AIC hadn't contacted the Administrative Agent, the Bank followed up with AIC about the withdrawal request. But as the district court later found, AIC never called the Administrative Agent.

The Destra units thus remained in the trust account. At the start of this dispute, they were still there. AIC complains that its inability to immediately access these assets left it with over $7 million in out-of-pocket liability from the reinsurance program.

E.

AIC sued the Bank. As relevant on appeal, AIC alleged claims for breach of contract, breach of fiduciary duty, and negligent misrepresentation. The thrust of AIC's complaint was that the Bank had improperly accepted the Destra units, violating Paragraph 8(b) of the trust agreement.

AIC asserted the Destra units were nontransferable without third-party consent and thus unsuitable for the trust account. Compounding this failure, said AIC, the Bank didn't transfer the securities when requested and had misrepresented the Destra units in account statements. The Bank counterclaimed for contractual indemnity.

8

After three years of pretrial skirmishing, the district court held a six-day bench trial. Fourteen witnesses testified, and the parties submitted three expert reports.

The district court found that the Bank had fully complied with its Paragraph 8(b) obligation to determine the Destra units' negotiability. *Accident Ins. Co. v. U.S. Bank Nat'l Ass'n*, No. 16-cv-02621, 2020 WL 1910096, at *17-18 (D.S.C. Apr. 20, 2020). Interpreting that duty, the court first construed the provision's undefined use of "negotiate." *Id.* at *17. It concluded that "[n]egotiability depends on whether a security is a physical stock certificate . . . or journal book-entry (like the Destra [units])." *Id.*

Because the Destra units were journal book-entries—meaning they had no physical documentation evidencing ownership—the Bank satisfied its duty when it relied on the trade instruction from Dallas National that the securities were "properly registered on the books and records of the transfer agent or registrar." *Id.* This was so, the court said, even though the Bank knew that it couldn't transfer the Destra units without the Administrative Agent's approval. *See id.* The court also reasoned that, once the Bank determined negotiability, Paragraph 8(b) didn't require any other action. *See id.*

The district court likewise found no breach of the Bank's Paragraph 3(b) duty to "take any and all steps necessary" to deliver trust assets when requested. J.A. 1591. Though the trust agreement didn't specify what steps were necessary, the court said that the Bank took such steps when it asked AIC to contact the Administrative Agent. *See Accident Ins. Co.*, 2020 WL 1910096, at *19. So the "question of whether [the] Bank took all steps [was] dependent" on AIC's communication with the agent. *Id.* Because AIC

9

hadn't shown it had contacted the agent, the court determined there were no further steps for the Bank to take. *See id.*

Last, the district court addressed AIC's claim that the Bank had misrepresented the Destra units as "Taxable Bonds" in account statements. AIC had asserted that those descriptions breached the Bank's fiduciary duties and were negligent misrepresentations. But the court found that the "Taxable Bonds" heading didn't misrepresent the Destra units, so that claim failed. *See id.* at *25, *27–*28 (cleaned up).

AIC moved for post-judgment relief, highlighting the district court's conclusions on Paragraphs 8(b) and 3(b) of the trust agreement. The court denied the motion. On AIC's contention that it wrongly defined "negotiate" under Paragraph 8(b), the court found such error would have been harmless. *See Accident Ins. Co. v. U.S. Bank Nat'l Ass'n*, No. 16-cv-02621, 2021 WL 1207469, at *7 (D.S.C. Mar. 31, 2021). The court again reasoned that "the issue of negotiability lack[ed] . . . significance" because Paragraph 8(b) didn't oblige the Bank to "refuse acceptance of an asset lacking in negotiability." *Id.* And AIC hadn't shown sufficient evidence, the court said, to overcome its finding that the Bank took all necessary steps to deliver trust assets under Paragraph 3(b). *See id.* at *8.

This appeal followed.

## II.

"We review a judgment following a bench trial under a mixed standard of review." *Equinor USA Onshore Props. Inc. v. Pine Res., LLC*, 917 F.3d 807, 813 (4th Cir. 2019) (cleaned up). We review legal conclusions, "including contract construction," de novo but

may reverse factual findings only if they are clearly erroneous. *Id.* In other words, we won't "disturb the district court's factual findings if they are plausible in light of the record viewed in its entirety." *Heyer v. U.S. Bureau of Prisons*, 984 F.3d 347, 355 (4th Cir. 2021) (cleaned up). Yet we may reverse a district court's factual finding if we're "left with the definite and firm conviction that a mistake has been committed." *Equinor*, 917 F.3d at 813 (cleaned up).

### III.

We start with AIC's claim that the district court misinterpreted the Bank's duty under Paragraph 8(b) of the trust agreement. This mistake, AIC says, resulted in the court's erroneous finding that the Bank hadn't breached its duty by accepting the Destra units for deposit.

Paragraph 8(b) required the Bank, "[b]efore accepting any Asset for deposit," to "determine that such Asset is in such form" that AIC or the Bank could "negotiate such Asset without consent or signature" from any other entity. J.A. 1593.

AIC's argument is twofold: (1) the court wrongly defined "negotiate" in Paragraph 8(b) by ignoring its ordinary meaning; and (2) the court misread the provision when it found that Paragraph 8(b) didn't require the Bank to reject assets that it determined were nonnegotiable without third-party consent.

11

And if we follow its reading of Paragraph 8(b), AIC asserts that the Bank breached its duty because it knew it couldn't negotiate the Destra units without the Administrative Agent's consent.  As we'll explain, we agree with AIC.[2]

A.

We first tackle AIC's contention that the district court erred in defining "negotiate." AIC relies on dictionary definitions and precedent to show that "negotiate" is linked to "a financial instrument's transferability."  Appellant's Br. at 23.  The district court erred, AIC says, by looking to extrinsic evidence to find that an asset like a Destra unit could be "negotiate[d]" merely when it was "properly registered on the books and records of [a] transfer agent."  *Accident Ins. Co.*, 2020 WL 1910096, at *17.

Under Delaware law, contract interpretation begins with the agreement's text.  *See Murfey v. WHC Ventures, LLC*, 236 A.3d 337, 355 (Del. 2020).  "When the contract is clear and unambiguous, [Delaware courts] will give effect to the plain-meaning of the contract's terms and provisions, without resort to extrinsic evidence."  *Sunline Com. Carriers, Inc. v. CITGO Petroleum Corp.*, 206 A.3d 836, 846 (Del. 2019) (cleaned up).

We're mindful that Delaware adheres to an "objective" approach to contract interpretation—that is, "a contract's construction should be that which would be understood by an objective, reasonable third party."  *Id.* (cleaned up).  If the contract remains "reasonably susceptible to two or more interpretations," only then may we find the

---

[2] AIC claims the Bank violated not just Paragraph 8(b) but also the similarly worded Paragraph 2(b).  But as our analysis reveals, 8(b)'s more-exacting language controls our finding on breach.

contract ambiguous and "resort to extrinsic evidence to determine the parties' contractual intent." *Id.* at 847 (cleaned up).

We agree with AIC that an objective, reasonable third-party would understand "negotiate" to refer to an asset's transferability, not its registration. *See* Appellant's Br. at 24. And because the term's meaning is clear and unambiguous, the district court erred in resorting to extrinsic evidence to arrive at a different result.

We need only consult dictionaries to conclude that "negotiate"—as used in Paragraph 8(b)—has a clear, unambiguous meaning. *See Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 738 (Del. 2006) ("Under well-settled case law, Delaware courts look to dictionaries for assistance in determining the plain meaning of terms which are not defined in a contract."). Dictionaries offer a near-universal definition for "negotiate" in the context of financial instruments. To "negotiate" means to "transfer ownership." *See, e.g.*, *Negotiate*, Black's Law Dictionary (10th ed. 2014) ("[T]o transfer . . . by delivery or indorsement, whereby the transferee takes the instrument for value, in good faith, and without notice of conflicting title claims or defenses.").[3]

---

[3] *See also Negotiate*, American Heritage Dictionary (5th ed. 2011) ("To transfer (an instrument, such as a promissory note) to another party by means of endorsement."); *Negotiate*, Merriam-Webster's Collegiate Dictionary (11th ed. 2011) ("[T]o transfer (as a bill of exchange) to another by delivery or endorsement[;] . . . to convert into cash or the equivalent value."); *Negotiate*, Webster's New World College Dictionary (5th ed. 2014) ("[T]o transfer, assign, or sell (negotiable paper)."); *Negotiate*, Oxford English Dictionary (3d ed. 2003), https://www.oed.com/view/Entry/125878 (last visited Aug. 10, 2022) ("To transfer or assign (a cheque, bill, or other document) to the legal ownership of another.").

13

What's more, the parties agree that Delaware courts recognize this ordinary meaning. They both point to *Wooleyhan v. Green*, which found the term "negotiable" applied to "any written instrument given as a security . . . which may be transferred by indorsement or delivery, vesting in the party to whom it is transferred or delivered a legal title." 155 A. 602, 603 (Del. Super. Ct. 1931). The Bank thus concedes that an asset can be negotiated if "it is in such form that it can be transferred with . . . legal title . . . vesting in the recipient." Appellee's Br. at 27.

Rather than deduce the plain meaning of "negotiate" with dictionaries or precedent, the district court relied on the Bank's expert to find that "[n]egotiability depends on whether a security is a physical stock certificate . . . or journal book-entry." *Accident Ins. Co.*, 2020 WL 1910096, at *17. This "negotiability" finding led to the court's ultimate conclusion on the meaning of "negotiate" vis-à-vis the Destra units. *See id.*

But Paragraph 8(b) of the trust agreement doesn't distinguish between asset types. And the Bank admits its expert derived his opinion not from the contractual text but from his "practice." *See* Appellee's Br. at 28. The district court erred in relying on such extrinsic evidence in the face of a clear and unambiguous term. *See Sunline Com. Carriers*, 206 A.3d at 846.

In short, Paragraph 8(b) required the Bank to determine that a trust asset was in such form that AIC or the Bank could "negotiate"—i.e., transfer ownership of—the asset without third-party consent.

14

B.

AIC next asks us to examine the broader scope of the Bank's Paragraph 8(b) duty. Contrary to the district court, AIC maintains that the provision required the Bank to reject a deposit if it couldn't transfer the assets without third-party consent. This reading stems from the Bank's obligation to determine an asset's proper negotiability "[b]efore *accepting* any Asset for deposit to the Trust Account." J.A. 1593 (emphasis added).

There's no dispute that the word "before" in Paragraph 8(b) required the Bank to determine an asset's negotiability in advance of accepting it. *See Before*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/before (last visited Aug. 10, 2022) (defining "before" as "in advance" or "at an earlier time"). Rather, the parties contest the meaning of "accepting." AIC says "accepting" required the Bank to make "an affirmative decision as to whether [an] asset would be 'admitted' to the trust account." Appellant's Br. at 27. For its part, the Bank posits that the trust agreement's use of "accepting" expressed "clerical, ministerial functions," not any affirmative duty. Appellee's Br. at 39. We agree with AIC.

"Accept" ordinarily denotes something more than mere receipt. To "accept" something means to "receive [it] willingly" or to "give admittance or approval." *Accept*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/accept (last visited Aug. 10, 2022); *see also Accept*, Oxford English Dictionary (3d ed. 2011), https://www.oed.com/view/Entry/1006 (last visited Aug. 10, 2022) (defining "accept" as "[t]o take or receive (something offered) willingly"). We thus find that Paragraph 8(b)'s use of "accepting" required the Bank to affirmatively decide whether to admit trust assets.

15

*See, e.g.*, *Worden v. SunTrust Banks, Inc.*, 549 F.3d 334, 346 (4th Cir. 2008) (finding the ordinary meaning of "accept" to be "something more than to receive" and that it required something "greater than passive receipt" (cleaned up)).

The Bank's argument to the contrary is unpersuasive.  It doesn't challenge the ordinary meaning of "accept."  Instead, it points to two instances in the trust agreement where "accept" purportedly connotes an administrative function.  In one provision, the agreement states that Dallas National "may direct the [Bank] to accept substitute Assets." J.A. 1592.  In another, the agreement instructs that the Bank "shall accept and open all mail."  J.A. 1594.

But the former merely allows Dallas National to propose deposits to the Bank—it doesn't eliminate the Bank's other duties.  And the latter expressly commands that the Bank "shall accept" mail, with no further qualification.  By contrast, Paragraph 8(b)'s reference to the Bank "accepting" assets has a condition precedent—the negotiability determination.  That condition precedent is proof that the parties didn't intend Paragraph 8(b) to function in a ministerial manner.

We conclude that Paragraph 8(b) required the Bank, before approving any asset for deposit into the trust account, to determine that the asset was in such form that AIC could negotiate it without third-party consent.  The logical consequence is that, if the Bank found that an asset wasn't in the proper form, it couldn't then accept it.

The district court thought otherwise, finding that "once the determination regarding whether an asset could be negotiated was made," Paragraph 8(b) didn't "require any further action from [the] Bank."  *Accident Ins. Co.*, 2020 WL 1910096, at *17.  But this reasoning

16

fails to appreciate that Paragraph 8(b) required the Bank to *affirmatively* determine an asset's negotiability before accepting it. *See* J.A. 1593 ("[T]he [Bank] shall determine that such Asset *is in* such form that [AIC] . . . may . . . negotiate such Asset without consent or signature from . . . any [other] person or entity." (emphasis added)). Paragraph 8(b) thus acted as a gatekeeping clause against deposit of nonnegotiable assets.

The Bank insists that, in so holding, we're rewriting the contract or supplying omitted terms. *See* Appellee's Br. at 35–36 (quoting *Murfey*, 236 A.3d at 357 ("[A]n interpreting court should be most chary about implying contractual terms when the contract could easily have been drafted to expressly provide for such terms, limitations or conditions.")). Not so. Our holding is the necessary result of the trust agreement's plain language.

And reading Paragraph 8(b) in view of the full trust agreement buttresses our conclusion. Paragraph 2(b) already imposed a freestanding duty for the Bank to "determine whether the Assets are in such form" that AIC could "negotiate" them without third-party consent. J.A. 1591. It would make little sense for AIC to contract for Paragraph 8(b)'s more demanding language unless AIC meant to impose additional responsibility on the Bank beyond the negotiability determination. To hold otherwise would reduce Paragraph 8(b) to an ink blot. *See United States v. Sanofi-Aventis U.S. LLC*, 226 A.3d 1117, 1129 (Del. 2020) ("When interpreting contracts, we construe them as a whole and give effect to every provision if it is reasonably possible." (cleaned up)).

The Bank counters that Paragraph 8(b) wouldn't be superfluous if we followed the district court's interpretation because "industry practice is not to reject" a nonnegotiable

17

asset. Appellee's Br. at 39. The Bank says the custom is instead to "accept the asset and work toward re-registration in the trust's or trustee's name." *Id.* But there's no reason to consider extrinsic evidence when the text speaks for itself.

The Bank's final salvo is that our interpretation contravenes the trust agreement's overall scheme, in which the Bank was merely "a directed trustee that acts on another's orders." Appellee's Br. at 38. It refers us to the trust agreement's provision authorizing the Bank to "follow and rely upon all instructions given by" the insurers, "[u]nless otherwise provided in [the] Agreement." J.A. 1594. The Bank also maintains that it was to "receive Assets from [Dallas National] . . . subject to the terms of [the] Agreement." J.A. 1590.

But in so arguing, the Bank turns a blind eye to the parties' express contemplation of instances when the Bank *wouldn't* act as a directed trustee. Both provisions the Bank relies on explain that its directed-trustee role was subordinate to contract terms providing otherwise. Paragraph 8(b) is such an exception.

We therefore conclude that Paragraph 8(b) of the trust agreement obliged the Bank to reject any proposed asset that it determined was nonnegotiable (i.e., nontransferable) without third-party consent.

## C.

Having resolved the proper scope of the Bank's responsibilities under Paragraph 8(b), we now consider whether the Bank breached that duty when it accepted the Destra units. We find that it did.

18

Citing the master agreement governing the Destra units, the district court found that the securities could "not be transferred without the approval of [the Administrative Agent]." *Accident Ins. Co.*, 2020 WL 1910096, at *17. So the Destra units were nonnegotiable without third-party consent. In fact, the court determined that the Bank was aware "of this perceived limitation on the transferability of Destra [units]." *Id.* The Bank doesn't challenge these findings.

These undisputed facts leave us with the definite and firm conviction that the Bank breached Paragraph 8(b) of the trust agreement. *See Equinor*, 917 F.3d at 813. The Bank *knew* it couldn't transfer the Destra units without the Administrative Agent's consent. Put differently, the Bank knew the Destra units weren't in the negotiable form Paragraph 8(b) mandated because transferring these securities required a third party's approval.[4] *See supra* § III.A. So the Bank couldn't then accept deposit of the Destra units without breaching Paragraph 8(b). *See supra* § III.B. But it did.

Undaunted, the Bank argues that the trust agreement's liability-limiting provisions spare it here. It first says that AIC wrongly conflates the Bank's "limited examination regarding negotiable form with substantive evaluations of marketability and liquidity." Appellee's Br. at 31. In doing so, the Bank points to trust-agreement provisions that said

---

[4] As much as the Bank argues the Destra units' "form" was separate from their inherent negotiability, that contention doesn't persuade. *See Form*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/form (last visited Aug. 10, 2022) (defining "form" in part as "the essential nature of a thing as distinguished from its matter"). The district court's factual findings bridge whatever gap may exist between the Destra units' negotiability and their form.

19

it had "no responsibility whatsoever to determine" asset eligibility.  J.A. 1593; *see* Appellee's Br. at 32.  But even if there were any overlap among the concepts the Bank identifies, Paragraph 2(b) of the trust agreement expressly addresses that concern.  It carves out the Bank's duty to determine negotiability from its exemption of liability on an asset's "qualification, character[,] or valuation."  J.A. 1591.

The Bank also insists that it's not liable because it could rely on Dallas National's instruction to deposit the Destra units.  This contention depends on the Bank's authorization, under the trust agreement, to "follow and rely upon all instructions given by" the insurers "[u]nless otherwise provided."  J.A. 1594.  The Bank wouldn't be liable for any actions taken "in good faith [reliance] on such instructions."  *Id.*  We reject this argument for two reasons.

First, the Bank's authorization didn't apply when the trust agreement provided otherwise.  Paragraph 8(b)'s affirmative obligations precluded the Bank from relying on instructions to blindly accept nonnegotiable assets.  To credit the Bank's position would render those obligations meaningless.

Second, we don't see how the Bank could have relied in good faith on Dallas National's instruction to deposit the Destra units since it knew it couldn't transfer them without a third party's say-so.  *See DV Realty Advisors LLC v. Policemen's Annuity & Benefits Fund of Chi.*, 75 A.3d 101, 110 (Del. 2013) (explaining that an entity engages in bad faith when its conduct is "so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any [other] ground" (cleaned up)).  And in any event, the Bank's own expert testified that Dallas National's instruction gave no "information that a

20

trustee could rely on as to whether or not [the] Destra [units] on [their] face could be transferred without the consent of a third party." J.A. 1392–93.

True, the trust agreement didn't charge the Bank "with knowledge of or any duties or responsibilities in connection with any other document or agreement," including the Destra units' master agreement. J.A. 1595. But we refuse to read this provision to mean the Bank was free to disregard the knowledge it already had.

*          *          *

In sum, the Bank breached Paragraph 8(b) of the trust agreement when it accepted deposit of the Destra units. We therefore vacate the district court's judgment on that claim and remand for further proceedings, expressing no position on the remaining elements.

IV.

We turn next to AIC's challenge to the district court's conclusion that the Bank didn't breach its Paragraph 3(b) duty. Under this provision of the trust agreement, the Bank had to "immediately take any and all steps necessary to transfer absolutely and unequivocally" trust assets as AIC requested.[5] J.A. 1591.

AIC complains that the district court erred in finding that the Bank's actions in attempting to transfer the Destra units constituted "all steps necessary to complete the

---

[5] Paragraph 3(b) also required the Bank to "deliver the physical custody" of requested assets. J.A. 1591. But the district court found the Destra units were held as a "book entry" with no corresponding "physical certificate" or "hard-copy document." *Accident Ins. Co.*, 2020 WL 1910096, at *20. AIC doesn't challenge this finding on appeal.

transfer" of those assets. Appellant's Br. at 46 (cleaned up). This finding, AIC says, improperly shifted Paragraph 3(b)'s burden onto its shoulders. But we find that the evidence adequately supports the district court's holding.

The basic facts are not in dispute. AIC sent a withdrawal notice to the Bank, seeking all assets in the trust account. Within a week, the Bank informed AIC that it would soon transfer all municipal bonds and cash in the account but that the Destra units would "require additional paperwork." J.A. 1653. True to its word, the Bank sent AIC the bonds and cash the next day.

About two weeks later, the Bank informed AIC that the Administrative Agent for the Destra units asked to speak with AIC about its "withdrawal request and the status of the Destra units." J.A. 1659. It provided contact information for the Administrative Agent's representative. The Bank then followed up with AIC on this point, reiterating its instruction to contact the representative.

From here, the district court determined that the Bank took a "necessary step" to transfer the Destra units to AIC when it twice asked AIC to reach out to the Administrative Agent. *Accident Ins. Co.*, 2020 WL 1910096, at *19. It then found that "the question of whether [the] Bank took all [necessary] steps [was] dependent on the result of [AIC's] communication with [the Administrative Agent]." *Id.* And because AIC hadn't shown it

---

So its contention that the Bank breached this aspect of Paragraph 3(b) is meritless, as there was nothing physical for the Bank to deliver.

22

made such contact, the court held that the Bank took all necessary steps to transfer the Destra units. *See id.*

AIC fails to meaningfully challenge the district court's conclusion that the Bank's next steps depended on AIC calling the Administrative Agent. It hasn't identified any facts to controvert that finding, nor does it point to any evidence reflecting necessary steps that the Bank failed to take. This omission is fatal—we won't hold the Bank liable for steps it couldn't take.

AIC suggests that the Bank breached its Paragraph 3(b) duty because the Destra units remain in the trust account. But this assertion does little to counter the district court's finding that any other steps necessary to complete transfer of the Destra units first required AIC to act.

We thus affirm the district court's judgment on AIC's Paragraph 3(b) claim.

## V.

Finally, AIC contends the district court erroneously rejected its breach-of-fiduciary-duty and negligent-misrepresentation claims that alleged the Bank had misrepresented the Destra units.[6] AIC premised these claims on the Bank's listing of the Destra units under a "Taxable Bonds" heading in account statements. But the district court determined that this heading neither misrepresented the units nor breached the Bank's fiduciary duties. We

---

[6] The Bank says AIC doubly waived these arguments. Even assuming AIC preserved its claims, we find them meritless.

23

affirm because AIC failed to establish that it relied on the heading. *See S. Power Co. v. Cleveland Cnty.*, 24 F.4th 258, 268 n.8 (4th Cir. 2022) ("We may affirm on any ground appearing in the record, including theories not relied upon or rejected by the district court." (cleaned up)).

For each claim, AIC had to prove that it relied on the "Taxable Bonds" heading to its detriment. *See Dohmen v. Goodman*, 234 A.3d 1161, 1174–75 (Del. 2020) (duty of disclosure); *Wilkin ex rel. Orexigen Therapeutics, Inc. v. Narachi*, No. 12412-VCMR, 2018 WL 1100372, at *14 & n.159 (Del. Ch. Feb. 28, 2018) (duty of loyalty); *Vichi v. Koninklijke Philips Elecs., N.V.*, 85 A.3d 725, 775 (Del. Ch. 2014) (negligent misrepresentation).

AIC, however, identifies no actions it took (or refrained from) because of the Bank's "Taxable Bonds" heading. To be sure, AIC highlights its accountant's testimony that he reviewed the Bank's account statements, focusing on "the specific investments to verify" what the Bank reported. J.A. 910–11. And it calls our attention to its executives who received the statements and said they had no reason to doubt the Bank's trustworthiness at the time.

But such evidence says nothing about how AIC relied on the "Taxable Bonds" heading to its detriment. Without more, AIC hasn't carried its burden to prove this element, so we affirm the district court's dismissal of these claims.

*AFFIRMED IN PART,*
*VACATED IN PART,*
*AND REMANDED*