**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 18-1693

KAYLA BUTTS, Individually and on behalf of her daughter A.F., a minor,

Plaintiff - Appellee,

v.

THE UNITED STATES OF AMERICA,

Defendant - Appellant,

and

BERKELEY MEDICAL CENTER; WEST VIRGINIA UNIVERSITY HOSPITAL, INC.; SHENANDOAH WOMEN'S HEALTH CENTER; SHENANDOAH COMMUNITY HEALTH CENTER; SHENANDOAH MIDWIVES; AVINASH PUROHIT, M.D.; TRACY SWALM, CNM; SARA SPURGEON, R.N.; SHELLY PALKOVIC, R.N.; REBECCA PFENDER, CNM; SARAH HARDY, M.D.; SONYA JUSTICE, R.N.,

Defendants.

Appeal from the United States District Court for the Northern District of West Virginia, at Martinsburg. Gina M. Groh, Chief District Judge. (3:16-cv-00053-GMG-MJA)

Argued: May 7, 2019                                           Decided: July 11, 2019

Before HARRIS, RICHARDSON and QUATTLEBAUM, Circuit Judges.

Reversed by published opinion. Judge Quattlebaum wrote the opinion, in which Judge Harris and Judge Richardson joined.

———————————

**ARGUED:** Joshua Marc Salzman, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellant. Barry John Nace, PAULSON & NACE, PLLC, Washington, D.C., for Appellee. **ON BRIEF:** Joseph H. Hunt, Assistant Attorney General, Mark B. Stern, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; William J. Powell, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Wheeling, West Virginia, for Appellant. Matthew A. Nace, PAULSON & NACE, PLLC, Washington, D.C.; D. Michael Burke, BURKE, SCHULTZ, HARMAN & JENKINSON, Martinsburg, West Virginia, for Appellee.

QUATTLEBAUM, Circuit Judge:

This case arises from a tragic set of events involving A.F., a baby born with severe respiratory problems who developed permanent brain damage. Kayla Butts ("Butts"), A.F.'s mother, brought this action claiming A.F.'s brain damage was caused by the medical malpractice of Dr. Sarah Hardy. More specifically, Butts contends that Dr. Hardy should have transferred A.F. from the hospital where A.F. was born to a hospital with a neonatal intensive care unit ("NICU") that could have provided the care A.F. needed in the hours after her birth. After a bench trial, the district court agreed and awarded Butts over seven million dollars in damages. On appeal, we consider whether Butts presented sufficient evidence to establish that Dr. Hardy violated the applicable standard of care. Because the district court's finding on this issue was clearly erroneous, we reverse the district court's order and vacate the judgment against Dr. Hardy.

I.

Butts delivered A.F. at Berkeley Medical Center ("Berkeley") in Martinsburg, West Virginia. Berkeley did not have a NICU, so infants who required additional support were cared for in Berkeley's "Max Care Nursery." The Max Care Nursery offered specialized care to newborn infants, including an oxygen-delivery system and equipment to provide intubation. However, the Max Care Nursery did not have all the equipment found in a NICU, including a breathing device known as a continuous positive airway pressure ("CPAP") machine. Infants delivered at Berkeley who needed specialized care Berkeley could not provide were often transported to the NICU at Winchester Medical Center ("Winchester") in Virginia.

3

At the time of these events, Berkeley was working to establish a NICU of its own. To that end, Berkeley hired Dr. Avinash Purohit, a board-certified neonatologist, to establish and manage a NICU. But Dr. Purohit arrived at Berkeley only a few days before A.F.'s birth and had not yet established a NICU.

A.F. was born at Berkeley around 9:00 a.m. and immediately exhibited signs of respiratory distress. In the minutes following delivery, A.F.'s Apgar score—a diagnostic tool that allows a physician to evaluate a child's physical health by measuring breathing effort, heart rate, muscle tone, reflexes and skin color—was low. Nurses provided immediate treatment to aid A.F.'s breathing, including suctioning A.F.'s airway. Ten minutes after birth, A.F.'s Apgar score had improved, but, because of these initial complications, she was transferred to Berkeley's Max Care Nursery.

Dr. Hardy, a pediatrician, was on call the morning of A.F.'s birth. Soon after A.F. was delivered, the hospital paged Dr. Hardy, and she arrived around 9:15 a.m. Dr. Hardy noticed A.F.'s respiratory distress and low glucose levels. She prescribed antibiotics to prevent infection and ordered a range of tests and diagnostics to assess A.F.'s breathing problems. Dr. Hardy also placed A.F. under an oxyhood, a device that provides supplemental oxygen.

Dr. Hardy then returned to her office for a few hours, while maintaining telephone contact with the attending nurse. While she was away, A.F., with the aid of the oxyhood, maintained acceptable oxygen-saturation levels, but continued to experience breathing difficulty. Dr. Hardy came back to Berkeley around noon. At that time, A.F. was not improving. For that reason, Dr. Hardy initially decided to transfer A.F. to the Winchester

4

NICU. However, a nurse manager at Berkeley suggested that Dr. Hardy consult Dr. Purohit prior to transfer. Dr. Hardy consulted with Dr. Purohit around 1:30 p.m. that afternoon. Dr. Purohit assured Dr. Hardy that Berkeley had the necessary equipment and staffing for him to provide care to A.F., and he specifically told Dr. Hardy that a transfer to the Winchester NICU was unnecessary. After that discussion, Dr. Purohit agreed to take A.F. on as his patient.

After taking over A.F.'s care, Dr. Purohit ordered tests and altered A.F.'s treatments. While there is some dispute as to whether Dr. Hardy complied with Berkeley's internal procedures for completing a formal transfer of responsibility for A.F.'s care to Dr. Purohit, the district court assumed that Dr. Hardy's responsibility for A.F. terminated at 2:45 p.m.

Over the next twenty-four hours, A.F.'s condition continued to deteriorate. Ultimately, on the afternoon of the day following A.F.'s birth, Dr. Purohit ordered her to be transferred to the NICU at Winchester. A.F. remained there for nearly a month. While the parties dispute the timing and cause, there is no dispute A.F. suffered irreversible brain injury from the insufficient flow of oxygenated blood to her brain.

As a result of A.F.'s injuries, Butts sued multiple defendants including Berkeley, Dr. Purohit and Dr. Hardy alleging medical malpractice. Because Dr. Hardy was employed by a federally-funded hospital, the United States substituted itself on behalf of Dr. Hardy under the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346(b), 2671−2680. Prior to trial, all defendants except the United States settled with Butts.

5

Butts's claim against the United States proceeded to a bench trial. After the trial, the district court issued findings in favor of Butts. The district court concluded "the standard of care required that A.F. be transferred to a NICU and receive the level of care that is only available in a NICU, such as the one at [Winchester]." J.A. 281. The court found "Dr. Hardy should have transferred A.F. to [Winchester] the same afternoon A.F. was born . . . ." J.A. 281. The court further found Dr. Hardy was not absolved by her transfer of care to Dr. Purohit because, even though he was a board-certified neonatologist, he "was without a NICU. Thus, at a minimum, he lacked the appropriate equipment, specialized staff or necessary protocols to adequately assess and treat a baby who needed intensive care." J.A. 281. The district court concluded that Dr. Hardy's failure to follow the applicable standard of care caused A.F.'s injuries and awarded Butts over seven million dollars in damages.[1]

The United States filed a timely appeal. We have jurisdiction of this appeal under 28 U.S.C. § 1291.

## II.

We review a judgment following a bench trial under a mixed standard of review. *Equinor USA Onshore Properties Inc. v. Pine Res., LLC,* 917 F.3d 807, 813 (4th Cir. 2019). While conclusions of law are examined de novo, we may reverse factual findings

---

[1] The district court did not apportion liability among the other defendants that settled prior to trial. Furthermore, the district court did not offset the damages award by the amount of Medicaid and Supplemental Security Income payments that the federal government will make to A.F. for her injuries.

only if they are clearly erroneous. *Id*. The clearly erroneous standard "does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently." *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573 (1985). Rather, "[i]f the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Id*. 573−74.

But while clear error review is deferential, it is not toothless. *United States v. Wooden*, 693 F.3d 440, 452 (4th Cir. 2012). A finding is clearly erroneous "when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson*, 470 U.S. at 573. (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948)). Pertinent here, this Court's conviction that a mistake has been committed may be properly based upon a conclusion that the findings under review "are not supported by substantial evidence" in the record.[2] *Miller v. Mercy Hosp., Inc.*, 720 F.2d 356, 361 (4th Cir. 1983).

---

[2] In reviewing this case, the standard we apply is effectively the same standard a trial judge applies in considering a motion for judgment as a matter of law under Federal Rule of Civil Procedure 50 in the context of a jury trial.

III.

On appeal, the United States argues Butts did not introduce sufficient evidence to support a conclusion that Dr. Hardy breached the applicable standard of care.[3] To establish breach, West Virginia law[4] requires a party bringing a medical malpractice claim to show that "[t]he health care provider failed to exercise that degree of care, skill and learning required or expected of a reasonable, prudent health care provider in the profession or class to which the health care provider belongs acting in the same or similar circumstances . . . ." W. Va. Code § 55-7B-3(a)(1); *see also MacDonald v. City Hosp., Inc.*, 715 S.E.2d 405, 423 n.22 (W. Va. 2011). The applicable standard of care, and the defendant's failure to meet the standard of care, must be established by the "testimony of one or more knowledgeable, competent expert witnesses if required by the court." *Id*. § 55-7B-7. A physician is not required to provide a patient with "the highest degree of care possible." *Bellomy v. United States,* 888 F. Supp. 760, 765 (S.D.W. Va. 1995) (citing

---

[3] The United States also raises the following issues on appeal: (1) whether the district court erred in concluding Butts introduced evidence supporting a finding that Dr. Hardy's treatment was the proximate cause of A.F.'s injuries; (2) whether the district court erred by failing to consider whether a share of liability should have been apportioned to other defendants who settled before trial; (3) whether the damages award must be reduced by the amounts that plaintiff will receive from federal benefits programs as compensation for the same injuries covered by the damages award; and (4) whether the district court erred in refusing to reduce the damages award by the amounts that plaintiff received from settling co-defendants as required by West Virginia law.

[4] Because this is an action brought under the FTCA, we apply "the substantive law of the state in which the act or omission giving rise to the action occurred." *Myrick v. United States*, 723 F.2d 1158, 1159 (4th Cir. 1983). Accordingly, we apply the substantive law of West Virginia in resolving this appeal.

*Schroeder v. Adkins*, 141 S.E.2d 352, 357 (W. Va. 1965)). "Moreover, where there is more than one method of medical treatment accepted and applied by average physicians similarly situated, the physician may take into account the particular circumstances of each case and may exercise his honest and best judgment in selecting a course of treatment for individual patients." *Id*. at 765–66. In fact, if there is more than one acceptable method of treatment, the physician need not choose the best one. *Id.* at 766 (citing *Maxwell v. Howell*, 174 S.E. 553, 554−55 (W. Va. 1934)).

On the issue of whether Dr. Hardy breached the applicable standard of care, Butts first called Dr. John C. Partridge, a physician who is board-certified in pediatrics and neonatal perinatal medicine. Dr. Partridge, the expert the district court found to be the most credible, testified to a reasonable degree of medical probability that by noon "the child, I think would have been better served, far better served in a different hospital." J.A. 500. Dr. Partridge further opined that, because of A.F.'s continuing symptoms and deteriorating condition, "that child should have been transferred." J.A. 501. But Dr. Partridge significantly qualified his opinion on cross-examination when he acknowledged that transfer to a NICU was not required. Rather, Dr. Partridge opined "the child should have been transferred either to a higher level of care within Berkeley Medical Center or to a NICU." J.A. 525. Dr. Partridge then acknowledged that Dr. Hardy did in fact transfer A.F. to Dr. Purohit, a board-certified neonatologist who had been hired to start a NICU at Berkeley. Dr. Partridge also opined on cross that the first time Dr. Purohit was required to transfer A.F. under the applicable standard of care was at 11:15 p.m. that night. Critically, this was almost nine hours after Dr. Hardy transferred care to Dr. Purohit.

9

Based on Dr. Partridge's testimony, Dr. Hardy did not violate any generally applicable standard of care. As discussed, a physician is not required to provide a patient with "the highest degree of care possible." *Bellomy*, 888 F. Supp. at 765. Additionally, where there is more than one acceptable method of treatment, the physician need not choose the best method. *Id.* at 766. Here, Dr. Partridge testified that Dr. Hardy could satisfy the standard of care by either transferring A.F. to a higher level of care within Berkeley Medical Center or to a NICU. The facts show, and Dr. Partridge acknowledges, that Dr. Hardy chose to transfer A.F. to a higher level of care within Berkeley by transferring care to Dr. Purohit. Based on Dr. Partridge's own testimony this was an acceptable method of treatment for Dr. Hardy to pursue, whether or not it was the best method of treatment. Therefore, Dr. Partridge's testimony fails to establish that Dr. Hardy breached the standard of care.

Butts next presented the testimony of Dr. Carol Miller, a board-certified pediatrician. Dr. Miller testified that Dr. Hardy breached the applicable standard of care by not transferring A.F. to a NICU. While she testified generally about other benefits of a NICU, Dr. Miller explained that A.F. needed to be transferred to a NICU to receive treatment with a CPAP machine or intubation. More specifically, when asked about the care A.F. would have received at a NICU that she did not receive at Berkeley, Dr. Miller responded "[m]ost importantly is enhanced respiratory support . . . . That could be in the way of CPAP, which is a method of giving increased pressure, or it could be intubating, which is what this baby needed . . . ." J.A. 755−76. Dr. Miller did not testify that a CPAP machine was medically necessary or preferable to intubation. Rather, she indicated that

10

either a CPAP machine or intubation could be used under the circumstances. Dr. Partridge agreed, testifying that the choice between using a CPAP machine and intubation is "a management style choice." J.A. 481−82.

Whether Dr. Miller realized it or not, intubation was available at Berkeley. Indeed, Dr. Purohit testified that he intubated a baby the first day he arrived at Berkeley, and the district court identified only one specific NICU-level intervention, a CPAP machine, that was not available at Berkeley. Because Dr. Hardy transferred A.F. to Dr. Purohit, who had the expertise and equipment to perform the treatment Dr. Miller said A.F. needed, Dr. Hardy's conduct did not fall below the standard of care.

We are mindful of our responsibility to consider the district court's findings on breach in light of the entire record. With that in mind, when the complete testimony of Dr. Partridge and Dr. Miller is considered together, Butts presented evidence that Dr. Hardy was required to transfer A.F. to a higher level of care to receive enhanced respiratory intervention. But that is what Dr. Hardy did. Dr. Hardy transferred A.F. to a board-certified neonatologist, Dr. Purohit, who assured Dr. Hardy that he had the equipment and ability to care for A.F. at Berkeley. Dr. Purohit had the ability to provide more aggressive respiratory intervention, including intubation. Intubation is the exact procedure that Dr. Miller said was required. And Dr. Partridge opined that once Dr. Hardy transferred care to Dr. Purohit, Dr. Purohit was not required to transfer A.F. to a NICU until 11:15 p.m. that evening. If Dr. Purohit was not required to transfer A.F. to a

11

NICU until 11:15 p.m., it cannot have been malpractice for Dr. Hardy to transfer A.F. to Dr. Purohit to receive an elevated level of care at 1:45 p.m. earlier that afternoon. [5]

## IV.

After reviewing the whole record, we are firmly convinced the district court's finding that Dr. Hardy breached the standard of care was a mistake. The district court's finding as to breach was not supported by substantial evidence in the record and was thus clearly erroneous. Specifically, the district court's finding on breach was not supported by Butts's own expert testimony. Therefore, despite the sympathy we feel for A.F., the district court's order finding Dr. Hardy liable for medical malpractice must be reversed.

Because we hold the district court erred in finding Dr. Hardy liable for malpractice, we need not address the remaining issues raised by the United States. The judgment of the district court is reversed, and the district court is directed to enter judgment in favor of the United States.

*REVERSED*

---

[5] The deficiencies in the testimony offered by Butts's experts are exacerbated because neither clearly articulated a standard of care in the first place. While they both used the "standard of care" label during their testimony, neither explained any meaningful criteria for judging A.F.'s conditions that required transfer. Put another way, neither expert appropriately said what was right before saying what was wrong.