**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 23-6211**

---

BURL WASHINGTON,

        Plaintiff – Appellant,

   v.

FEDERAL BUREAU OF PRISONS; UNITED STATES OF AMERICA,

        Defendants – Appellees.

---

Appeal from the United States District Court for the District of South Carolina, at Orangeburg. Bruce H. Hendricks, District Judge. (5:16-cv-03913-BHH)

---

Argued: October 31, 2024                  Decided: December 11, 2024

---

Before AGEE, QUATTLEBAUM, and RUSHING, Circuit Judges.

---

Affirmed in part, vacated in part, and remanded in part by unpublished per curiam opinion.

---

**ARGUED:** Leslie Bowman Arffa, SULLIVAN & CROMWELL LLP, New York, New York, for Appellant. Graham W. White, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees. **ON BRIEF:** Jeffrey B. Wall, Cason J.B. Reily, SULLIVAN & CROMWELL LLP, Washington, D.C., for Appellant. Brian M. Boynton, Principal Deputy Assistant Attorney General, Melissa N. Patterson, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Adair F. Boroughs, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Columbia, South Carolina, for Appellees.

—————————

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Burl Washington brought an action against the United States and the Federal Bureau of Prisons[1] ("BOP"), alleging violations of the Federal Tort Claims Act ("FTCA"), Section 504 of the Rehabilitation Act, and the Eighth Amendment. In his complaint, Washington alleged that BOP officials failed to adequately treat and provide accommodations for his serious medical condition (open-angle glaucoma) and attendant disability (legal blindness). The matter proceeded to a five-day bench trial, after which the district court rejected all of Washington's claims. On appeal, he contends that certain portions of the district court's decision regarding his FTCA and Section 504 claims were factually and legally erroneous. For the reasons explained below, we affirm in part, vacate in part, and remand for further proceedings consistent with this decision.

I.

Washington entered federal custody in 2009—four years after he was diagnosed with open-angle glaucoma.[2] By that point, his vision was already "substantially impaired." J.A. 77.

Over the ensuing decade, BOP transferred Washington four times: in October 2013, to FCI Williamsburg; in September 2015, to FCI Estill; in July 2017, to FCI Edgefield; and

---

[1] Washington also sued several individual defendants, but his claims against them were dismissed before trial. Those dismissals are not at issue on appeal.

[2] Open-angle glaucoma is a serious medical condition that, left untreated, can cause serious pain and permanent vision loss.

in May 2018, to FCI Butner, where he continues to reside. During that same timeframe, Washington received several eye-related surgeries,[3] sporadic assistance with the administration of his prescription eye drops, and certain other accommodations. Washington was also denied some accommodations that he had sought, including: (1) consistent, nurse-assisted administration of his prescription eye drops; (2) braille instruction and materials; (3) an alternative, low-vision lock; and (4) darker tinted glasses.[4] Washington's eyesight has continued to deteriorate over his period of incarceration. *See, e.g.*, J.A. 1014 (noting that Washington's vision in his right eye was "dramatically, if not fully, lost" by 2017).

Washington initiated this lawsuit in 2016, alleging that the course of care provided by BOP directly contributed to the progressive deterioration of his vision. In that regard, Washington asserted that (1) BOP's failure to provide medically necessary care for his glaucoma constituted medical malpractice and entitled him to monetary relief under the

---

[3] The surgeries most relevant to this appeal took place in July 2014 and February 2017. The 2014 surgery related to a cataract in Washington's right eye; it was a "very difficult" procedure that "didn't go well." J.A. 215. The 2017 surgery was diode laser surgery aimed at treating the glaucoma in Washington's left eye. Although the 2017 surgery was recommended in 2014, it was delayed due to (1) BOP's decision not to schedule the procedure earlier, and (2) Washington's refusal to consistently cooperate with his course of care. Specifically, BOP declined to schedule the surgery until May 2015, even though it was recommended in August 2014. And when the time came for the surgery to take place, Washington refused, contributing to the further delays that ensued.

[4] Tinted glasses are meant to help with light sensitivity, which can cause severe pain for glaucoma patients like Washington. There are four levels of tint, with "tint #4" being the darkest. BOP offered Washington "tint #3" glasses, which he refused.

4

FTCA, and (2) BOP's failure to provide certain accommodations entitled him to injunctive relief under the Rehabilitation Act.[5]

In August 2022, at the close of a five-day bench trial, the district court issued a brief oral ruling that Washington had "failed to prove" his FTCA and Rehabilitation Act claims. J.A. 1240. The district court later supplemented that ruling with written factual findings and conclusions of law, the relevant portions of which are summarized below.

Beginning with Washington's FTCA claim, the district court held that he "failed to prove by a preponderance of the evidence that there was any breach of the standard of care" by any BOP medical providers in treating his glaucoma. J.A. 228. Critical to that determination was the "highly credible and persuasive" testimony of Dr. Lane Ulrich, BOP's expert. J.A. 229. In particular, the district court credited Dr. Ulrich's conclusions that (1) "the delay in ophthalmological care following the August 2014 diode laser surgery recommendation was not a breach in the standard of care and did not measurably contribute to [Washington's] increased pain or vision loss," and (2) that it was "not a breach of the standard of care, during [the] relevant periods, to decline to provide [Washington] with an assistant to administer his eye[]drops." J.A. 229.[6] The district court found Dr. Ulrich's

---

[5] Washington also initially brought an Eighth Amendment claim. That claim was rejected by the district court and has not been renewed on appeal.

[6] While a finding of no breach ends the FTCA inquiry on its own, the district court also made two alternative holdings: (1) Washington failed to prove that any breach was the proximate cause of his alleged injuries, and (2) Washington's own negligence contributed more to his injuries than the purported negligence of any defendant(s). Either of these two holdings would independently bar Washington from recovering under the FTCA. We do not reach these alternate holdings as the finding of no breach of the standard of care resolves this case.

5

opinion to be more persuasive and "soundly grounded in the totality of the medical record" than the conflicting conclusions proffered by Washington's expert, Dr. Amy Kotecha. J.A. 229.

The district court next considered Washington's Rehabilitation Act claim and found it to be without merit: "In sum, the Court finds that the BOP provided reasonable accommodations for [Washington's] disability . . . . Nothing in the evidence or testimony indicates [Washington] was treated differently or denied access to any programs that were available to other prisoners *because* of his disability." J.A. 236 (emphasis in original) (citing *Baird ex rel. Baird v. Rose*, 192 F.3d 462, 469 (4th Cir. 1999)). In reaching this conclusion, the district court individually considered each accommodation sought by Washington. Most relevant here are its determinations regarding Washington's requests for (1) assistance with administering his eye drops, (2) braille instruction and materials, (3) an alternative, low vision lock, and (4) darker tinted glasses.

Turning first to Washington's eyedrop assistance request, the district court found that he "had been self-administering his eye[]drops for several years while he was legally blind and in BOP custody *before* he claimed a need for assistance at FCI Williamsburg." J.A. 233 (emphasis added). More to the point, the district court also found as fact that Washington "repeatedly demonstrated the ability to administer his own eye[]drops," but that he nevertheless "refused to do so." J.A. 233. The district court also credited Dr. Ulrich's testimony that "even a non-sighted person can self-administer drops successfully." J.A. 233. Relying on these factual findings, the district court held that Washington did not have a cognizable need for assistance administering his eye drops. *See* J.A. 233 (noting that the

6

"greater weight of the expert testimony" indicated that Washington did not need assistance with administering his eye drops). And regardless of any such need, the district court found that "BOP made reasonable efforts to accommodate" Washington's purported "need for assistance with his eye[]drops." J.A. 233.

The district court next held that Washington "did not establish by a preponderance of the evidence that the BOP failed to reasonably accommodate any supposed need for braille." J.A. 235. In support of this conclusion, the district court noted that there was "little to no *substantive* evidence that [Washington] has currently requested or is even interested in learning braille." J.A. 234–35 (emphasis in original). The district court also credited Dr. Lepiane's testimony that BOP would have provided braille instruction and materials to Washington, but that "it did not seem like braille was an interest, desire, or need of [his] at that time." J.A. 235.

Finally, the district court found that BOP "validly denied" Washington's request for darker tinted glasses and an alternative, low-vision lock "pursuant to BOP policy." J.A. 235; *see id.* ("[Washington] was, more than once, provided with the darkest tinted glasses permitted by BOP policy. . . . BOP's declination to break its own policy . . . was not a violation of the Rehabilitation Act."); *see id.* ("The BOP's declination to provide [Washington] an alternative lock based on the security decisions of its custody personnel was not a violation of the Rehabilitation Act.").

Washington timely noticed this appeal, arguing that the district court's FTCA and Rehabilitation Act conclusions are factually and legally erroneous. The Court has jurisdiction over the appeal pursuant to 28 U.S.C. § 1291.

7

II.

The Court reviews a judgment following a bench trial under a mixed standard of review. *Equinor USA Onshore Props. Inc. v. Pine Res., LLC*, 917 F.3d 807, 813 (4th Cir. 2019). Conclusions of law are examined de novo, while factual findings may be reversed only where they are clearly erroneous. *Id.* A finding is clearly erroneous when "although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948)); *Butts v. United States*, 930 F.3d 234, 238 (4th Cir. 2019) (quoting *Anderson*, 470 U.S. at 573). But "[i]f the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Anderson*, 470 U.S. at 573–74; *see Easley v. Cromartie*, 532 U.S. 234, 242 (2001).

Finally, and of particular importance here, "[i]n cases in which a district court's factual findings turn on assessments of witness credibility or the weighing of conflicting evidence during a bench trial, such findings are entitled to even greater deference." *Fed. Trade Comm'n v. Ross*, 743 F.3d 886, 894 (4th Cir. 2014) (quoting *Helton v. AT&T, Inc.*, 709 F.3d 343, 350 (4th Cir. 2013)).

8

III.

A.

We begin with Washington's FTCA claim. To prevail on this claim, Washington needed to establish, among other things, that BOP officials deviated from the standard of care they owed him. Because the evidence adduced at trial amply supports the district court's conclusion that BOP did not so deviate, Washington cannot now prevail on appeal.

The FTCA renders the United States "liable . . . in the same manner and to the same extent as a private individual under like circumstances" for the wrongful acts or omissions of a government employee acting within the scope of his employment. 28 U.S.C. § 2674. Importantly, FTCA claims are governed by the "law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). Washington therefore needed to establish at trial that BOP's failure to treat his glaucoma amounted to medical malpractice under South Carolina law, his place of incarceration at all relevant times.

To establish a cause of action for medical malpractice under South Carolina law, a plaintiff must prove the following by a preponderance of the evidence: (1) "[t]he presence of a doctor-patient relationship between the parties;" (2) "[r]ecognized and generally accepted standards, practices, and procedures which are exercised by competent physicians in the same branch of medicine under similar circumstances;" (3) the medical or health professional's negligence, i.e., their departure from the "generally accepted standards, practices, and procedures;" (4) that such negligence was a proximate cause of the plaintiff's

9

injury; and (5) "[a]n injury to the plaintiff." *Brouwer v. Sisters of Charity Providence Hosps.*, 763 S.E.2d 200, 203 (S.C. 2014) (citations omitted).

At trial, the only elements of Washington's medical malpractice claim in dispute were (3) and (4)—i.e., whether BOP had deviated from "generally accepted standards," and whether that deviation proximately caused Washington's injury. J.A. 227. These elements involve *factual* determinations. *See Sharpe v. S.C. Dep't of Mental Health*, 354 S.E.2d 778, 781 (S.C. 1987) (Bell, J., concurring) (noting that whether a defendant "failed to observe the standard of care required by law . . . and whether his conduct proximately caused damage to the plaintiff are questions of fact" (citing *Rogers v. Atl. Coast Line R.R. Co.*, 71 S.E.2d 585, 587 (S.C. 1952))). The district court's conclusions with respect to these findings are therefore subject only to clear error review.[7] *See Butts*, 930 F.3d at 238.

To establish that BOP deviated from the applicable standard of care, Washington points primarily to BOP's failure to (a) schedule diode laser surgery from August 2014 to May 2015,[8] and (b) provide him with daily assistance in administering his eye drops. As to the former, Washington contends that the delay caused his vision to deteriorate more quickly than it would have if BOP had scheduled the surgery sooner. And as to the latter, Washington argues that BOP's lack of assistance, coupled with his inability to self-

---

[7] Washington tries to muddy this distinction by arguing that the district court's factual determinations rested on a legally erroneous credibility determination. For the reasons explained below, this argument misses the mark.

[8] Washington points to this specific timeframe because the relevant surgery was recommended by Dr. Nutaitis in August 2014, but not scheduled by BOP officials until May 2015.

10

administer his eye drops, made it so that he was not receiving the care to which he was entitled. We consider these arguments in turn.

1.

Washington first maintains that BOP's failure to promptly approve his surgery in 2014 was a deviation from generally accepted standards (i.e., a breach of the standard of care) that caused his vision to further deteriorate. In his view, the district court's contrary conclusion merits reversal. We disagree.

Parsing through the record below shows that the district court's conclusion regarding the timing and necessity of Washington's surgery rested upon two main findings. First, the district court credited Dr. Ulrich's testimony that the August 2014 to May 2015 gap that followed Dr. Nutaitis' recommendation for diode laser surgery was not a deviation from the applicable standard of care. While Dr. Kotecha provided conflicting testimony on this point, the district court was well within its rights to determine which expert's testimony was more persuasive and credible. *See Ross*, 743 F.3d at 894 (quoting *Helton*, 709 F.3d at 350). And second, the district court found as a factual matter that Washington's referral for diode laser surgery was not intentionally delayed by the staff at FCI Williamsburg. *See* J.A. 105 ("It was not established by a preponderance of the evidence that [Washington's] referral for diode laser surgery was intentionally delayed. . . . Rather, the preponderance of the evidence showed that Dr. Loranth, . . . and the rest of the medical staff at FCI Williamsburg reasonably concluded that [Washington's] combative and sometimes bizarre behavior was sabotaging his own care."). In other words, the court found that the surgery

11

was mainly delayed because of concerns that Washington would, once again, sabotage his own care post-operatively.[9]

Based on these findings, the district court concluded that Washington did not "prove by a preponderance of the evidence" that the failure to accomplish the surgery between August 2014 to June 2015 "breached the standard of care." J.A. 229. Given the record below, as well as the ample discretion afforded to district courts in making such factual determinations following a bench trial, we hold that the district court did not clearly err when it concluded that BOP officials did not breach the standard of care they owed to Washington. *See Anderson*, 470 U.S. at 573–74. And because establishing such a breach is an essential element of Washington's FTCA claim, *see Brouwer*, 763 S.E.2d at 521, this portion of that claim (i.e., regarding BOP's failure to schedule surgery earlier) fails as a matter of law.

Washington raises several arguments to the contrary, but none are availing. For instance, Washington contends that he submitted ample evidence to establish breach and causation. But this argument is tantamount to a critique of how the district court weighed various pieces of factual evidence. And given the deferential standard of review at this

---

[9] The record below amply supports the district court's finding that Washington frequently delayed, refused, or otherwise interfered with his recommended course of care. *See, e.g.*, J.A. 84 (noting that Washington failed to attend a follow-up appointment for a prior eye surgery in 2014); J.A. 1269 (recording, in an August 2014 note from one of Washington's physicians, that there was suspicion that he "manipulate[d] the [eye drops] to cause his eye pressures [sic] to fluctuate"); J.A. 87 (indicating that Washington ultimately refused the requested diode laser surgery in 2015 after it was scheduled); J.A. 151 (stating that Washington frequently refused to cooperate with his treatment regimen "if [it] was not provided by his preferred medical staff members and for other unexplained reasons").

juncture, it is not incumbent upon this Court to overturn such factual findings, particularly where—as here—they are plausible and supported by the record reviewed in its entirety.[10] *Anderson*, 470 U.S. at 574.

Washington next argues that the district court improperly assumed that his noncompliance with medical treatment in one timeframe should count against him when assessing the denial of medical care in a later timeframe. He cites two cases in support of this proposition—*James v. Lister*, 500 S.E.2d 198 (S.C. Ct. App. 1998), and *Smith v. Smith*, 589 F.3d 736 (4th Cir. 2009). Neither is apposite. While the plaintiff's noncompliance with prior care was noted in *James*, it had no bearing on the court's actual analysis in that case. *See James*, 500 S.E.2d at 200, 201–04. And while *Smith* is marginally more on-point, it only concerned the types of inferences that may permissibly be made at the Rule 12(b)(6) stage. *See Smith*, 589 F.3d at 740 (holding that the district court incorrectly drew an inference against the plaintiff at the 12(b)(6) stage based upon his prior refusal to receive treatment). This case could not be more different. Here, the district court held a five-day bench trial, heard hours upon hours of evidence—including testimony from dueling experts and individuals who interacted with Washington—and based on that evidence, drew a

---

[10] Washington also relies heavily on *Christian v. United States*, C/A No. 1:21-1254, 2022 WL 2080147 (D.S.C. Apr. 6, 2022) (unpublished), to argue that the delay in surgery constituted a breach in the standard of care. But even if that case were binding on this court, it would still be inapposite. There, the recommending doctor specified that the contested eye surgery needed to take place "STAT." *Id.* at *1. Here, there was no such recommendation. Moreover, the plaintiff in *Christian* provided unrebutted expert testimony that the surgical delay—in the face of the "STAT" recommendation—constituted a breach in the standard of care. *See id.* at *2–5. Yet again, the same cannot be said here, where BOP's expert persuasively opined that the surgical delay did not constitute a breach of the duty of care.

reasonable conclusion regarding the reason Washington's surgery was not scheduled earlier. The district court did not clearly err in doing so. *See Easley*, 532 U.S. at 242; *Anderson*, 470 U.S. at 573–74.[11]

2.

Washington next insists that BOP's failure to consistently provide him with assistance administering his prescription eye drops was also a deviation from generally accepted standards of medical care. He contends that the district court's holding to the contrary was erroneous and should be reversed. Again, we disagree.

Like its conclusion regarding the diode laser surgery, the district court's conclusion with respect to assistance to Washington in the administration of his eye drops rested on two main findings. First, the district court credited Dr. Ulrich's testimony that BOP's declination to consistently provide daily hands-on assistance to Washington with the administration of his eye drops was not a deviation from the applicable standard of care. While the parties' experts disagreed on this point, the district court permissibly concluded

---

[11] Washington also argues that the district court erroneously discounted Dr. Kotecha's testimony that BOP breached a duty of care: "The court . . . faulted Dr. Kotecha for . . . failing to name the 'specific medical provider' who was negligent. . . . But there is no requirement under South Carolina law that a malpractice plaintiff show that a particular individual was negligent." Opening Br. 36. But even if Washington is correct that there is no such requirement, the district court was permitted to make a credibility determination based on what it determined was a relative weakness in Dr. Kotecha's testimony. *See Ross*, 743 F.3d at 894. And in any event, the district court apparently found Dr. Ulrich's conclusions on the matter more persuasive *regardless*. *See* J.A. 229 ("On the other hand, the Court found that testimony of Dr. Ulrich . . . to be highly credible and persuasive," particularly in view of his "extensive, highly relevant experience in evaluating and providing care in a correctional setting.").

that "the *great* weight of the testimonial and documentary evidence support[ed] Dr. Ulrich's opinion that, for those periods when the BOP medical staff did not administer [Washington's] eye[]drops for him, it was not a breach of the standard of care," J.A. 226 (emphasis in original). *See Ross*, 743 F.3d at 894 (noting that a district court's assessments of witness credibility or the weighing of conflicting evidence are entitled to significant deference). Second, the district court held that the evidence adduced at trial established that Washington could, in fact, self-administer his eye drops. J.A. 233 (noting that Washington could administer his own eye drops, and that his purported "need" for assistance administering his eye drops "was undermined by the greater weight of the expert testimony"). This factual finding is supported by "substantial evidence" in the record, so we will not disturb it. *Miller v. Mercy Hosp., Inc.*, 720 F.2d 356, 361 (4th Cir. 1983); *see, e.g.*, J.A. 104, 151, 166, 226 (various factual findings regarding Washington's ability to successfully self-administer his eye drops); J.A. 1313 (Dr. Lepiane note that Washington "has demonstrated the ability to properly use and apply his eye drops [h]owever he simpl[y] choices [sic] not to do so").

Taken together, these findings verify that the district court did not clearly err when it concluded that BOP did not deviate from the applicable standard of care by declining to always assist Washington with the administration of his eye drops. *See Anderson*, 470 U.S. at 573–74. And because establishing such a deviation is an essential element of Washington's FTCA claim, *see Brouwer*, 763 S.E.2d at 521, it fails as a matter of law.

Washington again makes several arguments in an attempt to avoid this conclusion, but none are persuasive. First, he argues that he adduced ample evidence at trial to establish

15

that he struggles with administering his own eye drops. Next, Washington highlights that his expert testified that BOP's failure to provide him with assistance in administering his eye drops constituted a breach of the applicable standard of care. And last, Washington emphasizes that BOP officials overrode the recommendations of his treating physicians when they declined to provide hands-on assistance with his eye drops.

As to each of these arguments, BOP adduced sufficient evidence at trial to support the opposite conclusion—that Washington did *not* need assistance with administering his eye drops. To that end, BOP established that, on numerous occasions throughout his period of incarceration, Washington was able to successfully self-administer his eye drops. BOP also showed that his purported "inability" to self-administer his eye drops often resulted from self-sabotaging behavior rather than a physical inability to administer the eye drops. *See, e.g.*, J.A. 233 ("[Washington] repeatedly demonstrated the ability to administer his own eyedrops, but then refused to do so. He also resisted or refused to accept his medications if his preferred provider was not administering the eyedrops."); *see also, e.g.*, J.A. 151 (citing that BOP "medical staff observed [Washington] successfully administer the eye[]drops on numerous occasions," but that he nevertheless "obstinately refused to use the eye[]drops properly"). Finally, and perhaps most importantly, BOP provided expert testimony—which the district court credited—that it did not deviate from the applicable standard of care by declining to assist Washington in the daily administration of his eye drops.

Ultimately, the district court was entitled to weigh this conflicting evidence and make the factual determinations it did. And because the district court's factual

determination that BOP officials did not deviate from the applicable standard of care by failing to regularly assist Washington with the administration of his eye drops is "plausible in light of the record viewed in its entirety," *Anderson*, 470 U.S. at 574, its decision must stand.

\* \* \*

In sum, the district court's conclusion that BOP officials did not deviate from the applicable standard of care by (1) delaying the recommended diode laser surgery from August 2014 to June 2015, and (2) failing to assist Washington with the administration of his prescription eye drops on some occasions was not clearly erroneous. Accordingly, we affirm the FTCA portion of the district court's decision.

## B.

We turn next to Washington's Rehabilitation Act claim. At trial, the dispute over this claim centered on whether BOP offered Washington reasonable accommodations for certain aspects of his blindness. The district court found that it did provide those accommodations and rejected Washington's Rehabilitation Act claim in its entirety. Because we disagree with certain portions of that conclusion, we affirm in part, vacate in part, and remand in part.

Section 504 of the Rehabilitation Act states that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

17

29 U.S.C. § 794(a). Since the language of § 504 of the Rehabilitation Act and Title II of the Americans with Disabilities Act ("ADA") "is substantially the same," courts "apply the same analysis to both."[12] *Doe v. Univ. Md. Med. Sys. Corp.*, 50 F.3d 1261, 1264 n.9 (4th Cir. 1995).

To establish a violation of § 504, a plaintiff must show by a preponderance of the evidence that: (1) he has a disability; (2) he is otherwise qualified for the public service, program, or activity in question; and (3) he was excluded from participation in or denied the benefits of such service, program, or activity, or otherwise discriminated against, solely because of his disability. *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 498 (4th Cir. 2005); *see Doe*, 50 F.3d at 1264–65; *Baird*, 192 F.3d at 467–70.

Here, there is no dispute that Washington satisfies the first two prongs. *See* J.A. 231–32. Instead, the parties' dispute on appeal primarily concerns whether BOP offered Washington reasonable accommodations for his blindness, thus ensuring he was not excluded from BOP programs or services. *See Constantine*, 411 F.3d at 498; *Richardson v. Clarke*, 52 F.4th 614, 619, 621 (4th Cir. 2022).

In Washington's view, BOP violated § 504 by failing to provide him with (1) braille instruction and materials, (2) an alternative, low-vision lock, (3) appropriately tinted

---

[12] That said, the causation standards under these two provisions are "significantly dissimilar." *Baird*, 192 F.3d at 469. A plaintiff seeking relief under Title II of the ADA must prove the disability "played a motivating role" in the challenged action, whereas a plaintiff seeking relief under Section 504 of the Rehabilitation Act must prove that the defendant's discriminatory conduct was "solely by reason" of the plaintiff's disability. *Id.* at 469–70.

sunglasses (i.e., tint #4, the darkest available); and (4) assistance administering his eye drops. We consider each accommodation, and the parties' attendant arguments, in turn.

1.

Beginning with braille, the district court concluded that Washington "did not establish by a preponderance of the evidence that BOP failed to reasonably accommodate any supposed need for braille on his part." J.A. 235. However, based upon the scant record below, we are unable to conduct proper appellate review of this holding.

To be sure, there is some evidence that Washington has requested a braille accommodation in the past. There is also some evidence that Washington has, on occasion, failed to take the necessary steps to obtain braille instruction and materials. But what we cannot determine from the record is whether Washington *currently* has any outstanding requests for braille instruction and materials. Particularly in view of BOP's representation at oral argument that braille materials would be provided if requested, more factual certainty is needed before we could definitively determine whether Washington has been denied what may or may not be a reasonable accommodation.[13]

The district court's conclusion with respect to braille is therefore vacated and remanded for further proceedings to determine, in the first instance, (1) whether Washington is now seeking a braille accommodation and (2) whether BOP has provided such accommodation, or if there is a valid reason to deny the same.

---

[13] Of course, if Washington is requesting and BOP provides the braille material and instruction, then this issue would likely be moot.

2.

Washington also sought an accommodation for #4 tinted glasses, which the district denied. It held that BOP "validly denied" Washington's request for these particular glasses "pursuant to BOP policy." J.A. 235.[14] While reliance on policy *alone* would likely not be enough to validly deny an otherwise meritorious accommodation request, BOP also emphasized the "increased tripping risk presented by the darker tint" glasses requested by Washington. J.A. 152. In other words, BOP proffered a valid, objective rationale as to why the darker tint glasses would not be a *reasonable* accommodation in view of the other dangers those glasses could pose. After exhaustively outlining and considering all the facts before it, the district court accepted this rationale. And on review, we cannot say that the district court erred clearly in doing so.

3.

Washington also sought—and was denied—an alternative, low vision lock. Reviewing this denial, the district court held that Washington's request was "validly denied . . . for security reasons pursuant to the [BOP policy and] the discretionary authority of the custody personnel at FC[I] Butner." J.A. 235. But again, reliance on policy alone is not enough to excuse BOP from what could otherwise be a violation of the Rehabilitation Act. *See Fry v. Napoleon Cmty. Schs.*, 580 U.S. 154, 159–60 (2017) (holding that the

---

[14] BOP did offer Washington #3 tinted glasses, the second darkest option after tint #4. Washington refused this offer.

Rehabilitation Act requires covered entities—like prisons—to "make 'reasonable modifications' to its 'policies, practices, or procedures,'" when doing so is necessary to accommodate those with disabilities). And unlike BOP's objective basis for denial with respect to the tinted glasses, it offered nothing beyond general BOP policy as supporting its denial of Washington's request for an alternative lock.[15] The district court erred in denying Washington's alternative lock accommodation request on a general policy rationale without examining, as applied to Washington, if that failure to accommodate was reasonable. We therefore vacate the district court's holding as to the alternative lock and remand for a determination in the first instance as to why providing such a lock to Washington is, or is not, a reasonable accommodation to him, considering his particular circumstances.

4.

The final facet of Washington's § 504 claim relates to his alleged need for assistance with administering his prescription eye drops. On this point, the district court held that (1) Washington's claimed need for such assistance was "undermined by the greater weight of the expert testimony," and (2) to the extent that Washington had such a need, "the preponderance of the evidence established that BOP made reasonable efforts to

_____

[15] The district court did vaguely reference "security reasons" and the "discretionary authority of the custody personnel at FC[I] Butner." J.A. 235. But it is unclear where these rationales come from, as they were not referenced anywhere else in the district court's findings of fact and conclusions of law.

accommodate [Washington's] need for assistance with his eye[]drops, which are typically self-carry medications." J.A. 233. These conclusions both find ample support in the record.

For essentially the same reasons described earlier with respect to Washington's analogous FTCA claim, the district court's factual finding that Washington did not need the requested assistance in administering his eye drops is not clearly erroneous. *See supra* Part III.A.1. This finding, alone, is sufficient to defeat Washington's § 504 claim for eye drop administration assistance. But even if it were not enough, there was also ample evidence in the record to support the latter portion of the district court's holding—that BOP did not violate § 504 because it *did* make "reasonable efforts to accommodate" Washington's alleged "need for assistance with his eye drops." J.A. 233; *see, e.g.*, J.A. 151, 189 (detailing the various attempts BOP staff made to provide Washington with assistance administering his eye drops); *see also* J.A. 236 ("[T]he [c]ourt finds that the BOP provided reasonable accommodations for [Washington's] disability, but [Washington] consistently rejected those reasonable accommodations and interjected unreasonable demands and expectations.").

\* \* \*

In summary, we vacate the district court's holdings as to BOP's denial of Washington's requests for braille instructions and materials, as well as for an alternative lock. That portion of the district court's decision is therefore remanded for further proceedings. The district court's holdings with respect to Washington's request for darker tinted glasses and assistance with the administration of his prescription eye drops are supported by the record and are therefore affirmed.

22

IV.

For the foregoing reasons, the district court's judgment is affirmed in part, vacated in part, and remanded for further proceedings consistent with this opinion.

*AFFIRMED IN PART, VACATED IN PART, REMANDED IN PART*